82 P.3d 411

In the Matter of the Arbitration between:

**DAIICHI HAWAI'I REAL ESTATE COR-PORATION, a Hawai'i Corporation, Lessee–Appellee,**

v.

**Rowlin L. LICHTER, Linda Maile Harris, and Marcy Friedman as Trustees of and for Martin H. Lichter Education Trust, Lessor–Appellants.**

No. 23285.

Supreme Court of Hawai'i.

Dec. 30, 2003.

Reconsideration Denied Jan. 20, 2004.

J. Stephen Street and Glen T. Melchinger, of Rush, Moore, Craven, Sutton, Morry, & Beh, Honolulu, on the briefs, for the Lessor–Appellants Rowlin L. Lichter, Linda Maile Harris, and Marcy Friedman, as trustees of and for Martin H. Lichter Education Trust.

Thomas Sylvester, of Carlsmith Ball LLP, Honolulu, on the briefs, for the Lessee Appellee Daiichi Hawai'i Real Estate Corporation.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., and ACOBA, J., dissenting.

Opinion of the Court by LEVINSON, J.

The lessor-appellants Rowlin L. Lichter, M.D., Linda Maile Harris, and Marcy Friedman, as trustees of and for the Martin H. Lichter Education Trust [collectively, "the trustees"], appeal from the findings of fact, conclusions of law, and order of the circuit court of the first circuit, the Honorable Gail C. Nakatani presiding, filed on February 18, 2000, vacating an arbitration decision dated September 12, 1999. On appeal, the trustees contend that the circuit court: (1) clearly erred in its findings of fact (FOFs) Nos. 8, 12, 13, 17, 18, 22, and 25 through 30; (2) erred in applying the standard of "evident partiality," as set forth in *Schmitz v. Zilveti, III*, 20 F.3d 1043 (9th Cir.1994), to its conclusions of law (COLs) Nos. 4 through 6 and 11 through 19; (3) erred in applying the code of ethics established by the International Center for Dispute Resolution for Arbitrators in Commercial Disputes to its COLs Nos. 10, 13, 20, and 21; (4) erred, as set forth in its COL No. 8, in concluding (a) that the disclosure by William M. Swope, Esq., the arbitrator appointed by the trustees to the three-member arbitration panel, was insufficient to shift the burden to the plaintiff-appellee Daiichi Hawai'i Real Estate Corporation (Daiichi) to investigate any conflicts of interest between the parties and Swope and (b) that Daiichi's failure to challenge Swope's appointment as an arbitrator did not constitute a waiver for purposes of a motion to vacate the arbitration decision based on "evident partiality," pursuant to Hawai'i Revised Statutes (HRS) § 658–9(2) (1993);[1] (5) erred, as

1. HRS § 658–9 provided:

> **Vacating award.** In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration:
>
> (1) Where the award was procured by corruption, fraud, or undue means;
> (2) Where there was *evident partiality* or corruption in the arbitrators, or any of them;
> (3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;

> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.
>
> Where an award is vacated and the time, within which the agreement required the award to be made, has not expired, the court may in its discretion direct a rehearing by the arbitrators.

(Emphasis added.) In 2001, the legislature repealed HRS chapter 658, *see* 2001 Haw. Sess. L. Act 265, §§ 5 and 8 at 820, and enacted the Uniform Arbitration Act (UAA), as codified in HRS chapter 658A. *See* 2001 Haw. Sess. L. Act 265, § 1 at 810–19. The legislative history reflects that the legislature globally adopted the UAA "to standardize Hawai'i's arbitration laws

set forth in its COL Nos. 25–26, in concluding that Swope had engaged in gross negligence and could not possibly have served as an impartial arbitrator; and (6) erred in concluding that Daiichi was entitled to its attorneys' fees and costs.

We agree with the trustees that the circuit court erred in concluding that Swope's disclosure was insufficient to shift the burden to Daiichi to investigate any conflicts of interest between the parties and Swope and that Daiichi's failure to challenge Swope's appointment as an arbitrator did not constitute a waiver for purposes of a motion to vacate the arbitration decision based on "evident partiality." Accordingly, we vacate the circuit court's findings of fact, conclusions of law, and order granting Daiichi's motion to vacate the arbitration decision, filed on February 18, 2000, and remand the matter to the circuit court with instructions to reinstate the arbitration decision dated September 12, 1999.

## I. BACKGROUND

### A. The Arbitration

The present matter arose out of an arbitration proceeding, convened pursuant to a lease contract between the trustees and Daiichi, the subject of the arbitration being the basic annual rent—for the fifteen-year period commencing June 1, 1998 and terminating May 31, 2013—payable by Daiichi, as the lessee, to the trustees, as the lessor, for the property located at 1776 Kapi'olani Boulevard [hereinafter, "the subject property"]. On June 1, 1973, Daiichi and the trustees had entered into a fifty-five-year lease contract [hereinafter, "the Lease"] relating to the subject property. The Lease set forth, *inter alia,* the rent to be paid by Daiichi during the initial ten-year period and provided that the rents payable during the three subsequent fifteen-year periods were to be renegotiated by the parties. The Lease further provided that any disputes arising out of rent negotiations were to be submitted to arbitration, pursuant to the provisions of HRS chapter 658.[2]

In 1998, after negotiations between Daiichi and the trustees failed to produce an agreement regarding the annual rent for the fifteen-year period commencing June 1, 1998 and terminating May 31, 2013, the parties proceeded to arbitration. Pursuant to the arbitration clause set forth in the Lease, each party was to appoint an arbitrator, and the two party-appointed arbitrators were jointly to appoint a neutral arbitrator in order to constitute a three-member arbitration panel. Daiichi appointed Robert C. Hastings, Jr., MAI, CRE, a real estate appraiser, to the panel. The trustees appointed Swope, a former partner in the Cades, Schutte, Fleming,

---

with those used in other states by replacing the current statutory chapter on arbitration and awards...." Conf. Com. Rep. No. 115, in 2001 Senate Journal, at 905.

HRS § 658A–23 (Supp.2002), which pertains to vacating an arbitration award, provides in relevant part:

**Vacating award.** (a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

(1) The award was procured by corruption, fraud, or other undue means;

(2) There was:

 (A) *Evident partiality* by an arbitrator appointed as a neutral arbitrator;

 (B) Corruption by an arbitrator; or

 (C) Misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;

(3) An arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing con-

trary to section 658A–15, so as to prejudice substantially the rights of a party to the arbitration proceeding;

(4) An arbitrator exceeded the arbitrator's powers;

(5) There was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection under 658A–15(c) not later than the beginning of the arbitration hearing; or

(6) The arbitration was conducted without proper notice of the initiation of an arbitration as required in section 658A–9 so as to prejudice substantially the rights of a party to the arbitration proceeding....

(Emphasis added.)

2. The arbitration clause set forth in the Lease did not specify any particular rules to be applicable to the proceeding. However, the circuit, without explanation, applied the American Arbitration Association's Code of Ethics for Arbitrators in Commercial Disputes.

& Wright law firm (CSF & W) to the panel. Swope and Hastings then appointed Harlin S.K.Y. Young, MAI, SRA, also a real estate appraiser, to "chair" the panel as the neutral arbitrator.[3]

On June 22, 1999, the parties executed a Submission Agreement (SA), which set forth, *inter alia,* the scope, procedures, and schedules to which the parties and arbitrators would adhere. The SA also contained disclosures by the arbitrators regarding any prior dealings with the parties. For purposes of disclosing his prior attorney-client relationship with the trustees, Swope had earlier requested that CSF & W produce all the records and files regarding its past representations of any trustees-related individuals or entities. A CSF & W employee, however, had informed Swope that the relevant files were purged and no longer existed. As a result, Swope relied on his own recollection in disclosing the following prior attorney-client relationship, as set forth in the June 22, 1999 SA:

> Mr. Swope discloses that he did render legal services for Rowlin L. The trustees, MD., that consisted of a review of a standard form of consent document[, dated August 28, 1995,] either in connection with an assignment of lease or for a mortgage lender in connection with the property in question. An issue of valuation was not involved. Mr. Swope recalls ... the documents being prepared by other legal coun-

sel and he was asked to approve the documents as to form and content.

In addition to the foregoing disclosure,[4] Swope submitted a "Supplemental Disclosure Statement" in response to a May 3, 1999 letter from the Carlsmith Ball law firm (Carlsmith), wherein Carlsmith sought additional disclosures from Swope "due to its comment that Cades Schutte Fleming & Wright may have previously represented Daiichi Finance Corporation, an affiliate of the lessee." Swope's supplemental statement recited the following:

> 1. William M. Swope is no longer active in the practice of law; rather he is Of Counsel to the Cades law firm.
>
> 2. He has never worked on any legal matter involving Daiichi Finance Corporation.
>
> 3. Following receipt of the Carlsmith Ball letter identified above, he has only recently been informed that other attorneys in the Cades firm may have handled legal matters involving Daiichi Finance Corporation and that such matters may have covered acquisitions, loans and condominium projects, but that none of such matters had anything to do with the valuation of the property at 1776 Kapiʻolani Blvd.
>
> 4. He has had no involvement of any kind, nor has he received any information of any kind regarding Daiichi Finance Corporation except that he only discovered that others had worked on matters as de-

**3.** Daiichi argued, and the circuit court ultimately found, that Swope "had been given lead responsibilities among the arbitrators" during the arbitration proceeding, particularly with respect to the rulings on the admissibility of evidence and the interpretation of a material term set forth in the Lease. At the hearing on the motion to vacate the arbitration decision, however, Yoichi Matsushita, a corporate vice-president of Daiichi, conceded that Young, the neutral arbitrator, ruled on the parties' objections after consulting with Swope, the only attorney appointed to the panel. Moreover, the parties' Submission Agreement (SA) expressly stated that "the two arbitrators so appointed have selected ... Young ... as the third Arbitrator (the 'Chair')."

**4.** Although Hastings's and Young's disclosures are not at issue in the present matter, the following additional disclosures were set forth in the SA:

Mr. Hastings discloses that: (1) he has served as an appraiser-arbitrator, appointed by Daiichi Hawaiʻi Real Estate Corp., for the rent determination for the property at 1739 Kalkaua for the period commencing February 1, 1998; (2) he has served as appraiser appointed by attorneys at Carlsmith Ball and Cades, Schutte, Fleming, & Wright firms in regard to various properties in Hawaiʻi; and (3) he has no prior involvement with the 7,242 square foot property at 1745 Kalkaua Avenue (TMK 2–3–22, parcel 9).

Mr. Young discloses that he has not previously appraised nor provided counseling regarding the property which is the subject of this arbitration. In the past[,] Mr. Young and his firm have provided appraisal services for both the Carlsmith Ball Wichman Case & Ichiki and Cades Schutte Fleming & Wright law firms and/or clients.

scribed in the above paragraph 3 as a result of the letter from Carlsmith Ball identified above.

On August 9, 1999, the arbitration commenced, during which Daiichi and the trustees presented oral arguments and adduced evidence relevant to the basic annual rent to be paid with respect to the subject property. There were four central issues presented to the arbitration panel: (1) the square-footage value of the subject property; (2) whether the annual rent should be based on three five-year periods, rather than one fifteen-year period; (3) the percentage rate of return on the subject property; and (4) whether to include the building with the underlying land in the valuation of the subject property. Daiichi requested that the panel assign the annual rent at approximately $56,000.00 per year based on one fifteen-year period; by contrast, the trustees requested a sliding scale of rent increases in five-year increments entailing a minimum rent in an amount between $134,000.00 and $152,000 during the first five-year period and approximately $201,000 during the third five-year period. (The record is unclear as to what the trustees' position was regarding the second five-year period.) On September 14, 1999, the three-member panel informed the parties by written correspondence of their decision, wherein the panel unanimously agreed to assign a basic annual rent of $87,500.00 for the subject property during a single fifteen-year period commencing June 1, 1998 and terminating May 31, 2013.

## B. *The Motion To Vacate*

On September 27, 1999, Daiichi filed a motion to vacate the arbitration decision, pursuant to HRS § 658-9(2), see supra note 1, on the basis that Swope had demonstrated "evident partiality" during the arbitration proceeding. Daiichi argued that Swope "never disclosed the extensive degree of his prior involvement, on behalf of and as attorney for Lichter, with the issues and the Lease involved in this arbitration, instead disclosing only that his services 'consisted of a review of a standard form consent document.' " [5] In particular, Daiichi contended that Swope "never disclosed that he had represented the trustees against Daiichi/Kapi'olani Capital ... that he had sent correspondence[, dated April 9, 1990,] directly to Daiichi/Kapi'olani Capital in which he purported to assert Lease rights on behalf of The trustees and threatened Daiichi/Kapi'olani Capital with consequences for any noncompliance." [6] Daiichi maintained that the

---

5. The former HRS chapter 658 contained no express provision relating to an arbitrator's duty to disclose. HRS § 658A-12 (Supp.2002), however, provides in relevant part:

> **Disclosure by arbitrator.** (a) Before accepting appointment, an individual who is requested to serve as *an arbitrator, after making a reasonable inquiry, shall disclose* to all parties to the agreement to arbitrate and arbitration proceeding and to *any other arbitrators any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator in the arbitration proceeding,* including:
>
> (1) A financial or personal interest in the outcome of the arbitration proceeding; and
>
> (2) *An existing or past relationship with any of the parties to the agreement to arbitrate or the arbitration proceeding, their counsel or representatives, a witness, or another arbitrator.*
>
> (b) *An arbitrator has a continuing obligation to disclose* to all parties to the agreement to arbitrate and arbitration proceeding and to any other arbitrators any *facts that the arbitrator learns after accepting appointment* which a

reasonable person would consider likely to affect the impartiality of the arbitrator.

> (c) *If an arbitrator discloses a fact required by subsection (a) or (b) to be disclosed and a party timely objects to the appointment or continued service of the arbitrator based upon the fact disclosed, the objection may be a ground under section 658A-23(a)(2) for vacating an award made by the arbitrator.*
>
> (d) *If the arbitrator did not disclose a fact as required by subsection (a) or (b), upon timely objection by a party, the court under section 658A-23(a)(2) may vacate an award.*
>
> (e) *An arbitrator appointed as a neutral arbitrator who does not disclose a known, direct, and material interest in the outcome of the arbitration proceeding or a known, existing, and substantial relationship with a party is presumed to act with evident partiality under section 658A-23(a)(2) ....*

(Emphases added.)

6. Project Coordinator's Office, Inc. (PCO), a Hawai'i corporation, was the original lessee of the subject property. On December 21, 1977, PCO assigned its interest in the property to Henry K.S. Fong and Kikue I. Fong [hereinafter, "the Fongs"]. On August 30, 1989, the Fongs as-

April 9, 1990 letter from Swope to Kapiʻolani Capitol (KC) addressed three provisions contained in the Lease, all of which were the subject of testimony and evidence presented at the arbitration proceeding in the present matter. Daiichi further asserted that, at the time of the arbitrators' disclosures, it "had no reason to believe that the disclosures were anything less than full and complete" until it "grew concerned that Mr. Swope exhibited evident partiality and bias in favor of the trustees...." Following the arbitration decision, Daiichi inspected its own Daiichi/KC files with respect to the subject property and uncovered the April 9, 1990 letter from Swope to KC.

On December 16, 1999, the circuit court conducted an evidentiary hearing on Daiichi's motion to vacate, at which the parties adduced the following relevant evidence. Yoichi Matsushita, a corporate vice-president of Daiichi, testified that Swope's disclosure implied that his previous attorney-client relationship with the trustees was minimal. Matsushita explained that it appeared from the disclosure that Swope "only reviewed several documents" and that, upon consultation with Daiichi's attorneys, Matsushita "didn't think that [Swope's prior dealings with the trustees] would affect [his] role as an arbitrator[.]" Matsushita acknowledged that, upon review of Swope's disclosure in the SA, he recalled the consent document referenced by Swope; Matsushita, however, did not retrieve Daiichi's personal lease files to review the consent document himself, because Swope's disclosure asserted that he "only reviewed those letters" and, therefore, "there was nothing to look at." Matsushita did send a copy of Daiichi's entire lease files, which included Daiichi's August 28, 1995 letter requesting consent to sublease the subject property, to Daiichi's attorneys. It was only *after* the arbitration decision, however, that Daiichi's attorneys requested that Matsushita "look through [the] lease files to see if [he] could find something that might indicate that Mr. Swope was more involved in representing the trustees" than Swope had disclosed in the SA; Matsushita conceded that Daiichi "wanted to find some way to

change the result of the arbitration." Nevertheless, Matsushita maintained that, "had Daiichi known of ... the length of time, the breadth[,] and the number of attorneys doing work for Dr. Lichter, as well as the volume of work Mr. Swope had done at the time of disclosure," Daiichi would have "probably objected to Mr. Swope becoming an arbiter."

Allen Wolff, Daiichi's lead counsel at the arbitration proceeding, also testified on Daiichi's behalf at the evidentiary hearing. In particular, Wolff explained that the first draft of the SA contained a waiver provision relating to disclosed and undisclosed matters. Daiichi objected to the waiver provision as inconsistent with the principles of chapter 658, and, by agreement, the final SA limited the waiver provision to disclosed matters. With respect to Swope's disclosures contained in the SA, Wolff testified that his "concerns were not great. The disclosure seemed candid and forthright and indicated Mr. Swope's prior involvement but was specifically limited to a very narrow matter, narrow issue, narrow task, all written in the past tense.... I did not regard the disclosure ... to be a disqualifying event...." Wolff elaborated that, because Swope phrased his disclosure in the past tense and utilized "limiting language"—*i.e.*, the phrase "that consisted of," rather than the phrase "among other things"—, Wolff understood Swope's involvement with the trustees "to be an isolated instance in the past." In addition, Wolff acknowledged that, upon reading Swope's disclosure, he did not request that Daiichi locate the relevant standard form of consent document in order to determine the accuracy of Swope's disclosure.

Wolff testified that he did not review the April 9, 1990 letter until late September 1999, after the arbitration decision had been rendered. Upon reading the letter, Wolff "was shocked because this letter went far beyond anything that [he] had understood to be Mr. Swope's prior involvement with this property based upon his disclosure." Wolff further remarked as follows:

signed their interest in the property to Kapiʻolani Capital, Inc., a Hawaiʻi corporation and a sub-

sidiary of Daiichi. On October 10, 1990, Kapiʻolani Capital, Inc. merged into Daiichi.

the contents of this letter offer three specific lease provisions that are being addressed, analyzed, discussed, and, if you will, threatened by Mr. Swope on behalf of his client [,the trustees,] against ... Daiichi.... And indeed, the letter, itself, was signed by Mr. Swope. It wasn't just a letter from the firm. It was a letter that had been personally penned by Mr. Swope.

Wolff also testified that neither Swope nor anyone related to the trustees had ever disclosed the existence of the April 9, 1990 letter prior to the arbitration proceeding.

Wolff testified that he participated in the drafting of the subpoena directed to CSF & W during the discovery phase of the present matter. CSF & W produced approximately fifteen hundred pages of documents, comprised of five volumes, relating to the firm's representation of Dr. Lichter and Lichter-related entities and individuals. Wolff organized the documents into twelve identifiable representations by CSF & W, nine of which directly involved Swope as counsel for Dr. Lichter personally or a Lichter-related entity over the course of fourteen years. Wolff testified that, had the foregoing information been available to him, either via disclosure in the original SA or via supplemental disclosure prior to the arbitration decision, he "would have, at a minimum, ... asked Mr. Swope to make a further and complete disclosure.... [He] would have brought this matter to the attention of [Daiichi] ... [and] sought the disqualification of Mr. Swope as an arbitrator."

The April 9, 1990 letter gave Wolff further pause, because the letter referred to provisions in the Lease relating to whether, for purposes of ascertaining the fair market value of the subject property, the building should be included in the arbitrator's determination of the basic annual rent for the property. Daiichi "would like to have known if Mr. Swope had any familiarity with the lease provisions on this lease" prior to the arbitration proceeding, particularly in light of the fact that the inclusion of the building in the arbitrators' valuation of the property was a matter of dispute among the parties.

Jon Yamamura, co-counsel with Wolff on behalf of Daiichi at the arbitration proceeding, testified that, upon review of Swope's disclosure statement set forth in the SA, he discussed "the potential for a conflict of interest" with Matsushita. Yamamura informed Matsushita that Daiichi could object to Swope's appointment as an arbitrator on the ground that Swope "might not be able to be an impartial arbitrator" due to Swope's duty of loyalty as counsel for Dr. Lichter. Yamamura testified that he inquired of Daiichi's representatives whether they possessed any information regarding the April 28, 1995 consent document, to which Daiichi responded in the negative, and that, per his discussion with Daiichi's representatives, he determined "more or less that if in fact Mr. Swope had reviewed a standard form consent," his involvement, "in and of itself[,] was a relatively non-substantive exercise" so as not to "present any significant issue for Daiichi as far as Mr. Swope was concerned." Yamamura acknowledged that the April 28, 1995 consent document had been in his possession since July 1, 1999, approximately one month prior to the commencement of the arbitration proceeding. Yamamura explained, however, that he "had no reason to believe that Mr. Swope's representation went anything beyond what was disclosed in the submission agreement."

Swope testified at length regarding his prior relationship with Dr. Lichter and the trustees and the disclosures relating thereto in the SA. Because Swope had participated in several arbitration proceedings in the past, and was familiar with the ethical rules governing arbitrators in the context of the duty to disclose relationships with any of the parties, Swope explained that he believed his disclosure to be in compliance with the ethical rules to the extent that he disclosed his involvement with Dr. Lichter, the trustees, and the subject property. In addition, Swope recalled a conversation with arbitrator Young, during which "[he] was under the impression that if [he] had anything to do with the valuation of the property, that was paramount to disclose." Swope, however, emphasized that his prior legal services had not concerned the valuation of the subject property. Swope testified that his final representation of Dr. Lichter was in 1995, which

involved his review of a deposit, receipt, offer, and acceptance (DROA) regarding the sale of Dr. Lichter's personal residence;[7] Swope stated that he had not disclosed the foregoing representations because he believed that they were subsumed within the disclosure that he had set forth in the SA, wherein he stated that he had "rendered legal services for [Dr. Lichter] that didn't involve valuation of the subject property." Swope insisted, "I wasn't trying to hide it, I just didn't think it was that relevant to what we were doing here."[8]

Swope explained that, at the time of his initial disclosure, he had been told by CSF & W that the relevant files no longer existed, and, therefore, that he was forced to rely on his memory in disclosing his prior relationships with Dr. Lichter and any Lichter- or trustees-related individuals or entities. During the discovery process, CSF & W informed Swope that the relevant files had not, in fact, been purged, after which Swope produced every CSF & W file available to him for Daiichi's review. Swope testified, however, that, had the documents been produced to him by CSF & W prior to his June 22, 1999 disclosure, he would not have necessarily altered his disclosure:

> I don't know because so many of the tasks there are under ... general legal services for Dr. Lichter and his wife. It [doesn't] relate to the property. I perhaps would have done a little more detail[ ] in the one I described [for] ... the consent document in connection with the assignment of [the] lease for a mortgage. I might have gone into a little more detail than that ... [if] I had access to those documents.

With respect to his participation in the Daiichi-trustees arbitration, Swope denied

that he played an "adversarial role for anyone," noting that he "took several positions contrary to the arguments being made by the Lichter group." In particular, Swope testified that he rejected the percentage rate of return (nine percent) requested by the trustees, opting instead to apply the percentage rate of return (eight percent) advanced by Daiichi. Swope also rejected the trustees' argument that the basic annual rent should be reopened every five years with incremental rent increases, presumably because such a request was in contravention to the express terms of the Lease, which provided for an initial ten-year rent period and three fifteen-year rent periods thereafter.

Swope further explained his reasoning in rejecting Daiichi's argument that the building atop the subject property should not be included in determining the property's fair market value.

> I looked at the first page of the lease and the rent when originally established, it covered [the] building and land. And the building was ... the then improvements of [the trustees], Your Honor. I thought that if the original rent covered [the building and land,] and the rent when it was renegotiated also covered those two items, I felt that it also should cover the land and building in this renegotiation.... [T]hat issue got settled very quickly among the arbitrators. It wasn't even debated.

With respect to the land value, Swope considered "two or three" values from the trustees' appraiser and "two or three" values from Daiichi's appraiser; the final value "was significantly lower than what [the trustees] had wanted and higher than [what Daiichi] had wanted."

Moreover, Swope testified that he did not base his determinations on knowledge ac-

7. The record reflects that Swope represented Dr. Lichter in several matters unrelated to the Lichter Trust and the subject property. Swope's representations included: (1) the drafting of a voting trust agreement for a corporation of which Dr. Lichter and his wife were shareholders; (2) the representation Dr. Lichter's son-in-law as the plaintiff in a declaratory action to interpret the scope and reasonableness of a restrictive covenant in an employment contract; and (3) the representation of Dr. Lichter and/or his wife in three personal estate matters.

8. At the hearing on Daiichi's motion to vacate, Swope clarified the nature of his personal relationship with Dr. Lichter. Specifically, Swope testified that he considered Dr. Lichter to be "an acquaintance" and not a close friend. The circuit court, however, expressly found that Swope "considered Dr. Lichter to be a 'friend and neighbor.'"

quired during his representation of Dr. Lichter or any trustees-related individuals or entities and that neither he nor CSF & W had a financial interest in the outcome of the present matter. Swope further testified that Daiichi never requested any supplemental disclosures from him regarding his representation of Dr. Lichter or the trustees and that, based on the disclosure set forth in the SA and the supplemental disclosures regarding CSF & W's representation of Daiichi Finance Corporation, Swope was aware that there had been an attorney-client relationship between CSF & W and both Daiichi and the trustees.

During argument on Daiichi's motion to vacate the arbitration decision, Daiichi asserted that Swope's failure fully to disclose the nature of his attorney-client relationship with Dr. Lichter and the trustees created a reasonable impression of bias, thereby constituting "evident partiality." Daiichi conceded its possession of at least two letters from Swope in its own lease files, contending, however, that "Daiichi had no reason whatsoever to look for those documents until it became concerned about the fairness of the process, the fairness of the proceedings[,] and the fairness of the award." Moreover, Daiichi contended that Swope's partial nondisclosure did not shift the burden to Daiichi to investigate the extent of his involvement with Dr. Lichter and the trustees. Finally, Daiichi acknowledged that, in the event the circuit court granted its motion to vacate the arbitration decision, it "may end up with a figure that's higher than what they would like, ... higher than what they got this time. But at least ... they will know that the process is fair and impartial if that occurs."

The trustees responded that Daiichi, in filing a motion to vacate the arbitration decision, was attempting "to preserve the opportunity to have a second bite at the apple." The trustees maintained that Daiichi should not "be rewarded for not looking through their files once they've had the disclosure that Mr. Swope was [Dr. Lichter's and the trustees'] attorney." In substance, the trustees argued that Swope's disclosure set forth in the SA placed Daiichi on notice of Swope's relationship with Dr. Lichter and the trustees.

They had been put on notice, they were concerned about it, they thought about it. And what did they decide to do? · What they decided to do was refuse to sign that submission agreement unless it was clear that they could be in here today challenging an arbitrator on bias if there were undisclosed matters. What was disclosed was that ... he had been [Dr. Lichter's and the trustees'] attorney, and that he had done work on this specific property....

....

Now, [Daiichi] is relying on *Schmitz v. Zilveti* [, 20 F.3d 1043 (9th Cir.1994),] to say that all they have to do is show that the disclosure was inadequate. Well, I mean, in that case, remember, disclosure failed to establish the [attorney-client] relationship. Once there's been a disclosure of this relationship, the quality, the nature, the extent of the relationship, all of the things that have been done, if that's the standard, if that's all they have to do to be able to challenge it, you will always be able to find some inadequacies in the description of this disclosure....

The trustees further argued that Daiichi had failed to establish "evident partiality" or "some behavior that affected their rights in the arbitration ... and there [was] no basis for any claim that anyone of [the arbitrators] ignored their ethical obligations to be fair, to hear all of the evidence and ... to fairly consider what was presented to them."

On February 18, 2000, the circuit court issued its FOFs, COLs, and order granting Daiichi's motion to vacate the arbitration decision. For present purposes, the following FOFs are relevant:

FOF No. 5: Daiichi was not concerned with the disclosure. Daiichi believed that there was nothing in the disclosure that indicated that Mr. Swope was currently the attorney for Dr. Lichter, Lichter Trust, or any of the various Lichter individuals or entities.

FOF No. 6: Daiichi believed that on the basis of the disclosure, the work that Mr.

Swope did for Dr. Lichter in the past was minimal.

FOF No. 7: Daiichi reasonably believed that the disclosure, with its limiting words "that consisted of" was a complete disclosure and not a disclosure that was merely representative of the type of things that had been undertaken by Mr. Swope on behalf of Dr. Lichter or a Lichter entity. Daiichi believed that the disclosure "was specifically limited to a very narrow matter, narrow issue, narrow task, all written in the past tense ... an isolated instance in the past."

FOF No. 8: Mr. Swope never disclosed that he and his law firm had a 14–year long attorney-client relationship with Dr. Lichter and eight other various The trustees entities.

FOF No. 9: Mr Swope never disclosed that he and his law firm had worked on at least 12 different matters for Dr. Lichter or for a Lichter entity.

. . . .

FOF No. 11: Mr. Swope never disclosed that he had represented Dr. and Mrs. Lichter on the sale of their personal residence.

FOF No. 12: Mr. Swope never disclosed that he had represented Dr. Lichter in the corporate management of his company as far back as 1989.

FOF No. 13: Mr. Swope never disclosed that as much as 10 years earlier, he had worked as co-counsel with Morton L. Friedman, Esq., with respect to The trustees Trust matters, the Lease, and the property involved in the arbitration.

FOF No. 14: Mr. Swope never disclosed that he had been retained by Dr. Lichter to represent Dr. Lichter's son-in-law in a business dispute involving court litigation.

FOF No. 15: Mr. Swope never disclosed that he had represented Dr. Lichter in the conveyance of real property as a charitable donation to Sierra Nevada College.

FOF No. 16: Mr. Swope never disclosed that he was the primary lawyer in his law firm for matters relating to Dr. Lichter and that at least six other attorneys in his law firm had also rendered legal services on behalf of Dr. Lichter or Lichter entities.

FOF No. 17: Mr. Swope never disclosed that an attorney-client privilege between his law firm and The trustees Trust subsists even to the present day. . . .

FOF No. 18: Mr. Swope himself testified that he recalled some of the work he had done for Dr. Lichter, but that he chose not to fully disclose the nature of his representation of Dr. Lichter, Lichter Trust, or the various Lichter entities because he decided that such full disclosure was not relevant.

. . . .

FOF No. 20: Upon learning that there was an undisclosed matter where the arbitrator's law firm had represented a corporate affiliate of Daiichi, Daiichi requested that Mr. Swope make a supplemental disclosure relating to his firm's prior work for Daiichi's corporate affiliate.

. . . .

FOF No. 22: During the arbitration hearings, Mr. Swope had been given lead responsibility among the arbitrators for addressing legal and evidentiary issues, including the admissibility of evidence not disclosed in accordance with the Submission Agreement, the scope of cross examination and an interpretation of a material term of the Lease provisions. These rulings were not rendered in favor of Daiichi.

FOF No. 23: At a site inspection prior to the arbitration hearings, Mr. Swope, Mr. Friedman, and Dr. and Mrs. Lichter portrayed themselves in a business like manner but not as friend and neighbor.

FOF No. 24: Moreover, at the arbitration hearings, Mr. Swope, Mr. Friedman, and Dr. Lichter portrayed themselves as cordial but unknown to one another.

FOF No. 25: Mr. Friedman and Dr. Lichter, both of whom were present throughout the arbitration hearings, knew that Mr. Swope and his law firm had represented many Lichter entities repeatedly over the preceding 14–year period.

FOF No. 26: The only context in which Mr. Swope and Mr. Friedman appear to have known each other was from their 10–

year association as co-counsel for Lichter Trust.

FOF No. 27: As late as October 8, 1999, Lichter Trust maintained that Mr. Swope wrote only one letter for the Lichter Trust approximately nine and one-half years prior to the arbitration.

FOF No. 28: The Lichter Trust maintained that position during oral argument at the October 19, 1999 hearing on Daiichi's Motion to Vacate....

FOF No. 29: Following the October 19, 1999 hearing, the Court ordered the parties to proceed to an Evidentiary Hearing on this matter. When discovery was undertaken by Daiichi in preparation for that evidentiary hearing, Daiichi discovered more than 1,500 pages of documents in Cades Schutte Fleming & Wright's possession relating to its 14 years of representing Lichter entities.

FOF No. 30: Daiichi would have sought Mr. Swope's disqualification from serving as an arbitrator if, prior to the arbitration, the extent of his involvement and his law firm's involvement with Mr. Friedman, Dr. Lichter, Lichter Trust, or the other various Lichter entities had been disclosed.

(Citations omitted.) In addition, the circuit court concluded in COL No. 8 that,

[b]y disclosing only one discrete and minor representation, Mr. Swope could not shift to Daiichi the burden to investigate and discover the vast expanse of the hidden relationship between the arbitrator and the many The trustees entities. Unlike the facts in *Behring Int., Inc. v. Local 295 International Brotherhood of Teamsters etc.*, 449 F.Supp. 513 ([E.D.N.Y.] 1978) and *Kiernan v. Piper Jaffray Companies, Inc.*, 137 F.3d 588 ([8th Cir.] 1998), the disclosure in this case was insufficient to shift the burden to Daiichi to investigate or to constitute a waiver of any challenge.

On March 17, 2000, the trustees filed a notice of appeal.

## II. STANDARDS OF REVIEW

### A. Review Of An Arbitration Award

Where a party challenges an arbitration award, the following precepts are

applicable. First, "[b]ecause of the legislative policy to encourage arbitration and thereby discourage litigation," *Gadd v. Kelley*, 66 Haw. 431, 441, 667 P.2d 251, 258 (1983), arbitrators have broad discretion in resolving the dispute. Upon submission of an issue, the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts. *See Loyalty Development Company, Ltd. v. Wholesale Motors, Inc.*, 61 Haw. 483, 605 P.2d 925 (1980); *Ching v. Hawaiian Restaurants, Ltd.*, 50 Haw. 563, 445 P.2d 370 (1968). In fact, where the parties agree to arbitrate, "they thereby assume[ ] all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact." *Mars Constructors, Inc. v. Tropical Enterprises, Ltd.*, 51 Haw. 332, 336, 460 P.2d 317, 319 (1969).

Second, correlatively, "judicial review of an arbitration award is confined to 'the strictest possible limits[.]'" *Gadd*, 66 Haw. at 441, 667 P.2d at 258 (quoting *Mars Constructors*, 51 Haw. at 335, 460 P.2d at 319). An arbitration award may be vacated only on "the four grounds specified in [HRS] § 658–9" and modified and corrected only on "the three grounds specified in ... [HRS] § 658–10[.]" *Mars Constructors*, 51 Haw. at 336, 460 P.2d at 319. Moreover, the courts have "no business weighing the merits of the ... award." *Local Union 1260 International Brotherhood of Electrical Workers v. Hawaiian Tel. Co.*, 49 Haw. 53, 58, 411 P.2d 134, 137 (1966).

Third, HRS §§ 658–9 and –10 "also restrict the authority of [appellate courts] to review judgments entered by circuit courts confirming [or vacating] the arbitration awards[.]" *Mars Constructors*, 51 Haw. at 336, 460 P.2d at 320.

*Sousaris v. Miller*, 92 Hawai'i 534, 541, 993 P.2d 568, 575 (App.1998) (quoting *Salud v. Financial Security Ins. Co.*, 7 Haw.App. 329, 331–32, 763 P.2d 9, 10–11, *cert. denied*, 70 Haw. 664, 796 P.2d 501 (1988)), *aff'd*, 92

Hawai'i 505, 993 P.2d 539 (2000) (some brackets added and some in original).

### B. *Findings Of Fact And Conclusions Of Law*

We review a trial court's [findings of fact] under the clearly erroneous standard.

"A [finding of fact] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *State v. Kane,* 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Investments Co.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (quoting *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994))). [A finding of fact] is also clearly erroneous when "the record lacks substantial evidence to support the finding." *Alejado v. City and County of Honolulu,* 89 Hawai'i 221, 225, 971 P.2d 310, 314 (App.1998) (quoting *Nishitani v. Baker,* 82 Hawai'i 281, 287, 921 P.2d 1182, 1188 (App.1996)). *See also State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Roxas v. Marcos,* 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting *Kawamata Farms v. United Agri Products,* 86 Hawai'i 214, 253, 948 P.2d 1055, 1094 (1997) (quoting *Takayama v. Kaiser Found. Hosp.,* 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation, some internal quotation marks, and original brackets omitted))).

*[State v.] Kotis,* 91 Hawai'i [319,] 328, 984 P.2d [78,] 87 (1999) (footnote omitted) (brackets in original).

Hawai'i appellate courts review conclusions of law *de novo,* under the right/ wrong standard. *See Associates Fin. Services Co. of Hawai'i, Inc. [v. Mijo],* 87 Hawai'i [19] at 28, 950 P.2d [1219] at 1228. "Under the right/wrong standard, this court 'examine[s] the facts and answer[s] the question without being re-quired to give any weight to the trial court's answer to it.'" *Estate of Marcos,* 88 Hawai'i at 153, 963 P.2d at 1129 (citation omitted).

*Robert's Hawai'i School Bus, Inc. v. Laupahoehoe Transportation Co., Inc.,* 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999).

*Beneficial Hawai'i, Inc. v. Kida,* 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001) (quoting *Leslie v. Estate of Tavares,* 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999)) (some brackets added and some in original).

### III. *DISCUSSION*

### A. *This Court Has Jurisdiction To Address The Merits Of The Trustees' Appeal Of The Circuit Court's Order Granting Daiichi's Motion To Vacate The Arbitration Decision.*

As a threshold matter, Daiichi asserts that this court lacks jurisdiction to consider the trustees' appeal, on the basis that the circuit court's order granting its motion to vacate the arbitration decision was not a final order. Daiichi points out that, in awarding Daiichi reasonable attorneys' fees and costs, the circuit court ordered Daiichi to file an affidavit documenting its fees and costs and permitted the trustees to file a response, after which the circuit court would render a decision as to the amount of reasonable attorneys' fees and costs that it would award Daiichi. Daiichi contends that only *after* the circuit court rendered the foregoing award of attorneys' fees and costs would the order granting the motion to vacate the arbitration decision be final. Daiichi argues that, because the trustees filed their notice of appeal "only one minute after submitting [their] response to Daiichi's affidavit on fees and costs," thereby allegedly divesting the circuit court of jurisdiction to finalize the matter of attorneys' fees and costs (which was still *sub judice*), the trustees' notice of appeal was premature. The trustees respond that their notice of appeal was timely filed, pursuant to HRS § 658–15 (1993). We agree with the trustees that we have jurisdiction to address the merits of the circuit court's order granting Daiichi's motion to vacate the arbitration decision.

HRS § 658–15 provided that, "[u]nless the agreement for award provides that no appeal may be taken[,] an appeal may be taken from an order vacating an award...."[9] *See Oppenheimer v. AIG Hawai'i Ins. Co.,* 77 Hawai'i 88, 92, 881 P.2d 1234, 1238 (1994) (concluding that "the more specific Arbitration and Award statute, HRS chapter 658, must prevail over the general appeal statute, HRS § 641–1"). The trustees filed their notice of appeal of the circuit court's February 18, 2000 order on March 17, 2000, which was within the thirty-day period prescribed by Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(1) (2000). That being the case, this court has jurisdiction to address the merits of the trustees' appeal of the circuit court's order granting Daiichi's motion to vacate the arbitration decision.

### B. *Daiichi Waived Its Right To Challenge The Arbitration Decision In The Present Matter.*

The trustees argue, *inter alia,* that the circuit court's COL No. 8 was wrong in concluding that Daiichi had not waived the right to challenge Swope's appointment as an arbitrator on the basis of "evident partiality," pursuant to HRS § 658–9(2), *see supra* note 1. The trustees' primary contention is that, although Swope did not disclose "each specific task performed" in representing Dr. Lichter, as well as persons and entities associated with him, Swope nevertheless disclosed the general nature of his attorney-client relationships to a degree sufficient to charge Daiichi with actual knowledge of Swope's prior involvement with the subject property. The trustees also maintain that neither the Lease nor the SA mandated that Swope disclose any and all minor or unrelated matters during the course of his, or CSF & W's, representation of Dr. Lichter or Lichter- or trustees-related entities or individuals.

The trustees further assert that Daiichi, having in its actual possession the "undisclosed" document—*i.e.,* the April 9, 1990 letter from Swope to KC, upon which it relied in its motion to vacate the arbitration deci-

sion—prior to the commencement of the arbitration proceeding, had, at a minimum, constructive knowledge of the nature and scope of Swope's prior legal services regarding the subject property. The trustees caution this court that "[t]o vacate an award based on the 'evident partiality' of a party-appointed arbitrator, when the challenging party was informed of the relationship between the arbitrator and the other party [prior to the commencement of the arbitration proceeding], will open the floodgates to arbitration challenges and completely overrun the policy of finality of arbitration decisions." Consequently, the trustees contend that Daiichi has waived its right to object to the arbitration decision on the basis of any "evident partiality" on Swope's part.

Finally, the trustees argue that the circuit court erred in concluding that "Daiichi had no duty to investigate Swope's potential bias, of which it was aware[,] prior to the arbitration[.]" In substance, the trustees maintain that "Daiichi cannot have it both ways" by weighing the risks of Swope's attorney-client relationship with Dr. Lichter and the trustees, deciding not to object to Swope's appointment as an arbitrator at the outset of the arbitration proceeding, and thereafter challenging the unfavorable arbitration decision based on Swope's alleged failure to disclose information that Daiichi already possessed.

Daiichi counters that the circuit court correctly concluded that Swope was subject to a duty to disclose the full extent of his relationship with Dr. Lichter, the trustees, and related persons and entities, as set forth in COL No. 8, and that the disclosure was insufficient to shift the burden to Daiichi to investigate Swope's disqualifying conflict of interest regarding the trustees. Daiichi contends that Swope's duty to disclose extended to a *continuing* obligation to investigate any conflicts of interest by making a reasonable effort to inform himself of any interests or relationships that could bias his role as an arbitrator. Daiichi asserts that only Swope and the trus-

9. In 2001, the legislature repealed HRS § 658–15, see Haw. Sess. L. Act 265, §§ 5 and 8 at 820, and enacted HRS § 658A–28. *See* Haw. Sess. L. Act 265, § 1 at 819. HRS § 658A–28 provides in

relevant part that "[a]n appeal may be taken from ... [a]n order vacating an award without directing a rehearing...."

tees, including Dr. Lichter, knew "the extent of the undisclosed relationship. Only they were in a position to preserve the integrity of the process and to protect the rights of the parties to the arbitration, including Daiichi, to make an informed decision about Arbitrator Swope's ability to serve as an arbitrator." Based on the foregoing, Daiichi maintains that Swope's failure to disclose and investigate fully the nature of his prior relationship with Dr. Lichter and persons and entities associated with him gave rise to a reasonable appearance of partiality, thereby warranting the vacating of the arbitration decision.[10]

We hold that Daiichi, having had both actual and constructive knowledge of Swope's prior attorney-client relationship with Dr. Lichter et al. and having failed to object to Swope's appointment as a party-appointed arbitrator, waived its right to challenge the arbitration decision based on Swope's alleged "evident partiality."

"It is well settled that the legislature overwhelmingly favors arbitration as a means of dispute resolution." *Tatibouet v. Ellsworth,* 99 Hawai'i 226, 234, 54 P.3d 397, 405 (2002).

It is generally considered that parties resort to arbitration to settle disputes more expeditiously and inexpensively than by a court action; and also that the objective is to have disputes considered by arbitrators, who are familiar with the problem, in a less formal and combative environment. Thus, it must be deemed that the primary purpose of arbitration is to avoid litigation.

*Mars Constructors, Inc. v. Tropical Enters., Ltd.,* 51 Haw. 332, 334, 460 P.2d 317, 318–19 (1969). Moreover, " '[t]he effectiveness of arbitration as a vehicle for the resolution of disputes depends in part upon the predictability of its efficiency.' " *Tatibouet,* 99 Hawai'i at 234, 54 P.3d at 405 (quoting *Leeward Bus Co. v. City and County of Honolulu,* 58 Haw. 64, 71, 564 P.2d 445, 449 (1977)). In order to ensure the efficiency of an arbitration proceeding, judicial review of arbitration decisions is confined to the grounds set forth

in HRS § 658–9, *see supra* note 1. *Id.*; *Mars Constructors, Inc.,* 51 Haw. at 335, 460 P.2d at 319 ("This court has decided to confine judicial review to the strictest possible limits."); *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 681 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983) ("The standards for judicial intervention are narrowly . . . drawn to assure the basic integrity of the arbitration process without meddling in it.").

 HRS § 658–9(2), *see supra* note 1, provided that "the court may make an order vacating the award . . . [w]here there was evident partiality . . . in the arbitrators . . . ." Cf. HRS § 658A–23(a)(2)(A) (limiting the ground for vacating an arbitration award on the basis of "evident partiality" to the "arbitrator appointed as a neutral arbitrator"). " '[E]vident partiality' is present when undisclosed facts show 'a reasonable impression of partiality.' " *Schmitz v. Zilveti,* 20 F.3d 1043, 1046 (9th Cir.1994) (citations omitted). "The burden of proving facts which would establish a reasonable impression of partiality rests squarely on the party challenging the award." *Sheet Metal Workers Int'l Ass'n Local Union # 420 v. Kinney Air Conditioning Co.,* 756 F.2d 742, 745 (9th Cir.1985).

 Insofar as section 10(b) of the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*) is the federal counterpart of HRS § 658–9(2), this jurisdiction's appellate courts have consistently relied on federal case law in ascertaining what constitutes "evident partiality" under HRS § 658–9(2). *Sousaris,* 92 Hawai'i at 542, 993 P.2d at 576; *Salud,* 7 Haw.App. at 336, 763 P.2d at 11.

What constitutes "evident partiality" sufficient to vacate an arbitration award is a difficult question. *See Salud,* 7 Haw. App. at 333, 763 P.2d at 11. Under Hawai'i law, "evident partiality" sufficient to vacate an arbitration award may be demonstrated when a conflict of interest exists with the arbitrator. That is, when an arbi-

---

**10.** It is noteworthy that Daiichi failed in its answering brief directly to address the trustees' waiver argument or the fact that Daiichi possessed the documents upon which it relied in pressing its motion to vacate prior to the commencement of the arbitration proceeding. In-

stead, Daiichi's responses to the trustees' arguments on appeal focus solely on the insufficiency of Swope's disclosure and Swope's failure to investigate the full extent of CSF & W's attorney-client relationships with Dr. Lichter and persons or entities associated with him.

trator has a personal, professional, or business relationship with a party, its counsel, principal, or agent, a conflict of interest may arise sufficient to justify vacating that arbitration award. *Salud,* 7 Haw.App. at 333, 763 P.2d at 11–12. Hawai'i courts have explained that evident partiality not only exists when there is actual bias on the part of the arbitrator, but also when undisclosed facts demonstrate a "reasonable impression of partiality." *Sousaris v. Miller,* 92 Hawai'i 534, 542, 993 P.2d 568, 576 (Haw.App.1998) (quoting *Schmitz v. Zilveti, III,* 20 F.3d 1043, 1046 (9th Cir.1994), after explaining that Hawai'i relies on federal case law in determining what constitutes evident partiality), *aff'd,* 92 Hawai'i 505, 993 P.2d 539 (2000).

*Valrose Maui, Inc. v. Maclyn Morris, Inc.,* 105 F.Supp.2d 1118, 1124 (D.Haw.2000) (footnotes omitted) (finding that the arbitrator's failure to disclose an *ex parte* communication with one of the parties' attorneys regarding the possibility of serving as a mediator in an unrelated action or his eventual appointment as a mediator in the action constituted "evident partiality"); *see also Schmitz,* 20 F.3d at 1048–49 (holding that an arbitrator's failure to investigate and thereafter disclose his law firm's representation of the parent company of one of the parties to the arbitration proceeding created a "reasonable impression of partiality"); *Pitta v. Hotel Ass'n of New York City, Inc.,* 806 F.2d 419, 423–24 (2d Cir.1986) (concluding that an arbitrator could not preside over a grievance dispute, the subject of which was the validity of his own alleged dismissal from employment with one of the parties); *HSMV Corp. v. ADI Ltd.,* 72 F.Supp.2d 1122, 1130 (C.D.Cal.1999) (concluding that the arbitrator's failure to disclose his law firm's contemporaneous representation of the Commonwealth of Australia, which owned one of the parties to the arbitration, constituted "evident partiality"); *Brennan v. Stewarts' Pharmacies, Ltd.,* 59 Haw. 207, 223, 579 P.2d 673, 682 (1978) (holding that a party-appointed arbitrator's failure

to disclose that he had been employed by the appointing party as its representative and chief negotiator to negotiate the monthly rent for the subject property with the non-appointing party constituted "evident partiality"); *cf. Sphere Drake Ins. Ltd. v. All American Life Ins. Co.,* 307 F.3d 617, 623 (7th Cir.2002) (holding that the party-appointed arbitrator, who had also represented a subsidiary of the appointing party in an unrelated matter four years prior to the arbitration, was not "evidently partial" for failing to disclose his prior involvement with the appointing party); [11] *Merit,* 714 F.2d at 681–83 (holding that, although the arbitrator's failure to disclose the fact that one of the parties to the arbitration was his former employer violated governing legal and ethical standards for arbitrators, it did not constitute "evident partiality"); *United States Wrestling Fed'n v. Wrestling Div. of AAU, Inc.,* 605 F.2d 313, 315–16, 322 (7th Cir.1979) (affirming an award despite the neutral-arbitrator's failure to disclose that his law firm had an ongoing attorney-client relationship with Northwestern University, which was tangentially related to one of the parties).

In *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the United States Supreme Court addressed the circumstances under which 9 U.S.C. § 10(b) authorizes the vacation of an arbitration award for failure to disclose the existence of a close financial relationship between a *neutral* arbitrator and a party to the arbitration. 393 U.S. at 146–48, 89 S.Ct. 337. The neutral member of a three-arbitrator panel failed to disclose that he had engaged in periodic and significant business relations with one of the parties to the arbitration for approximately six years prior to the arbitration. *Id.* at 146, 89 S.Ct. 337. The arbitrator voted with the panel for an award in favor of the party with whom he had prior business dealings. *Id.* The losing party thereafter challenged the award on the basis that the arbitrator's failure to disclose his prior business relationship resulted in

**11.** In concluding that there was no "evident partiality," the court in *Sphere Drake Ins. Ltd* emphasized that, if the party-appointed arbitrator "could have served as a federal judge in this case, it is impossible to see how his background

could demonstrate 'evident partiality' within the meaning of § 10(a)(2)," which is "considerably more confined than the rule applicable to judges." 307 F.3d at 621–22; *see also* discussion *infra.*

"evident partiality," thereby warranting a vacation of the award. *Id.* at 148–50, 89 S.Ct. 337. The United States Supreme Court reversed the decision of the United States Court of Appeals for the First Circuit, which affirmed the district court's refusal to set aside the arbitration award. *Id.* at 150, 89 S.Ct. 337.

It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by the single requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias.

*Id.* at 149–50, 89 S.Ct. 337.

While joining the majority opinion, Justice White concurred separately to offer some "additional remarks" regarding the arbitration process and the judiciary's role in reviewing arbitration awards:

[A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial. I see no reason automatically to disqualify the best informed and most capable potential arbitrators.

The arbitration process functions best when an amicable and trusting atmosphere is preserved and there is voluntary compliance with the decree, without need for judicial enforcement. This end is best served by establishing an atmosphere of frankness at the outset, through disclosure by the arbitrator of any financial transactions which he has had or is negotiating with either of the parties. In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise. And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize its role in arbitration as judge of the arbitrator's impartiality. That role is best consigned to the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.

Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.

*Id.* at 150–52, 89 S.Ct. 337 (White, J., concurring) (footnote omitted).

 *Commonwealth Coatings* emphasized the manifest importance of a neutral arbitrator disclosing "to the parties any dealings that might create an impression of possible bias." 393 U.S. at 149–50, 89 S.Ct. 337. However, not all dealings rise to the level of creating the impression—or reality—of possible bias so as to warrant vacating an arbitration award based on "evident partiality." *See Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79, 83 (2d Cir.1984) (noting that the disqualification of all arbitrators based on any prior professional or social

relationship with one of the parties "would make it impossible, in some circumstances, to find a qualified arbitrator at all"); *Peabody v. Rotan Mosle, Inc.*, 677 F.Supp. 1135, 1139 (M.D.Fla.1987) (holding that an arbitrator's failure to make *full* disclosure of his relationship with a non-party expert witness was not so significant that it constituted "evident partiality"). Consequently,

> [t]he mere fact of a prior relationship is not in and of itself sufficient to disqualify arbitrators. The relationship between the arbitrator and the party's principal must be so intimate—personally, socially, professionally, or financially—as to cast serious doubt on the arbitrator's impartiality. If all arbitrators' relationships came into question, finding qualified arbitrators would be a difficult, sometimes impossible, task.

*Washburn v. McManus*, 895 F.Supp. 392, 399 (D.Conn.1994) (citations and internal quotation signals omitted) (some brackets added and some deleted).

In *Schmitz*, the United States Court of Appeals for the Ninth Circuit recognized an arbitrator's duty to investigate the possibility of conflicts of interest, which was distinct from the concomitant duty to disclose them and that "[a] violation of this independent duty to investigate may result in a failure to disclose that creates a reasonable impression of partiality under *Commonwealth Coatings*."[12] *Schmitz*, 20 F.3d at 1048. In particular, the *Schmitz* court noted that an arbitrator who is also a lawyer may have an independent duty to investigate potential conflicts of interest that he or she has with the parties to the arbitration. *Id.*; *see also HSMV Corp.*, 72 F.Supp.2d at 1129 (finding "that [the arbitrator], as a lawyer, had a duty to investigate whether a conflict may exist prior to his engagement as the sole 'neutral' arbitrator in this dispute"). The *Schmitz* court, however, expressly declined "to adopt a *per se* rule that no reasonable impression of partiality can be found absent a showing that the arbitrator knew the facts on which it was

based." 20 F.3d at 1049 (holding that, in light of the arbitrator's "constructive knowledge and the presence of the conflict," the arbitrator's failure to investigate and thereafter disclose the conflict to the parties to the arbitration "resulted in a reasonable impression of partiality under *Commonwealth Coatings*").

On the other hand, *Commonwealth Coatings* is silent as to whether "party-appointed arbitrators" are governed by the same standards to which "neutral-arbitrators" are held. *See Sphere Drake Ins. Ltd.*, 307 F.3d at 623 ("The point of *Commonwealth Coatings* is that the sort of financial entanglements that would disqualify a judge will cause problems for a, *neutral* [arbitrator] under [9 U.S.C.] § 10(a)(2) unless disclosure is made and the parties' consent obtained.") (Emphasis added.). Moreover, it stands to intuitive reason that a party-appointed arbitrator might view the proceeding through a more subjective and partial lens than a neutral arbitrator.

When a neutral arbitrator fails to disclose a relationship with one party that casts significant doubt on the arbitrator's impartiality, as in *Commonwealth Coatings*, it is appropriate to assume that the concealed partiality prejudicially tainted the award. But where the parties have expressly agreed to select partial party arbitrators, the award should be confirmed unless the objecting party proves that the party arbitrator's partiality prejudicially affected the award.

*Delta Mine Holding Co. v. AFC Coal Props., Inc.*, 280 F.3d 815, 821–22 (8th Cir.2001); *see also Washburn*, 895 F.Supp. at 399 ("[C]ourts have commented that some subjectiveness is tolerated and even expected."); *Astoria Med. Group v. Health Ins. Plan of Greater New York*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d 85, 88 (1962) ("[T]he very reason each of the parties contracts for the choice of his own arbitrator is to make certain that his 'side' will, in a sense, be represented on the tribunal."); *Aetna*

---

12. The parties in *Schmitz* submitted a dispute to arbitration before the National Association of Securities Dealers (NASD), at which the NASD's arbitration rules and procedures applied. 20 F.3d at 1044. The NASD Code expressly provid-

ed that an arbitrator had a duty to investigate potential conflicts of interests. *Id.* It appears, however, that the holding in *Schmitz* is not limited to cases arising under the NASD Code. *See HSMV Corp.*, 72 F.Supp.2d at 1129–30.

*Cas. & Sur. Co. v. Grabbert*, 590 A.2d 88, 92 (R.I.1991) ("[I]t would be inappropriate to require the party-appointed arbitrator to adhere to the same standard of neutrality as a judge. That standard ignores the practical realities of arbitration panels partly composed of party-appointed arbitrators.").[13]

Indeed, the American Arbitration Association's (AAA's) Code of Ethics for Arbitrators in Commercial Disputes (1977) [hereinafter, "Code of Ethics"], upon which the circuit court relied in its COL Nos. 10, 13, 20, and 21, supports the foregoing distinction between a party-appointed arbitrator's and a neutral arbitrator's duty to disclose potential conflicts of interest with the parties to an arbitration proceeding. *See Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 759 (11th Cir.1993) (noting that "[t]he AAA ... recognizes inherently different rules for neutral and nonneutral arbitrators and imposes less exacting rules upon nonneutral arbitrators"); *Astoria Med. Group*, 227 N.Y.S.2d 401, 182 N.E.2d at 87 ("Arising out of the repeated use of the tripartite arbitral board, there has grown a common acceptance of the fact that the party-designated arbitrators are not and cannot be 'neutral,' at least in the sense that the third arbitrator or a judge is."). Specifically, Code of Ethics Canon II provides that "an arbitrator should disclose any interest or relationship likely to affect impartiality or which might create an appearance of partiality or bias."

*Disclosure*

A. Persons who are requested to serve as arbitrators should, before accepting, disclose[:]

1. Any direct or indirect financial or personal interest in the outcome of the arbitration;

2. Any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators should disclose any such relationships which they personally have with any party or its lawyer, or with any individual whom they have been told will be a witness. They should also disclose any such relationships involving members of their families or their current employers, partners or business associates.

By contrast, Code of Ethics Canon VII[14] addresses "ethical considerations relating to arbitrators appointed by one party" and provides in relevant part:

*Introductory note*

In some types of arbitration in which there are three arbitrators, it is customary for each party, acting alone, to appoint one arbitrator. The third arbitrator is then appointed by agreement either of the parties or of the two arbitrators, or, failing such agreement, by an independent institution or individual. In some of these types of arbitration, all three arbitrators are customarily considered to be neutral and are expected to observe the same standards of ethical conduct. However, there are also many types of tripartite arbitration in which it has been the practice that the two arbitrators appointed by the parties are not considered to be neutral and are expected to observe many but not all of the same ethical standards as the neutral third

---

**13.** Furthermore, the notion that party-appointed arbitrators are not expected to be totally impartial would seem to inform the restrictive language of HRS § 658A–23, which limits "evident partiality" as a basis for vacating an arbitration award to neutral arbitrators. *Compare* HRS § 658–9(2) ("[T]he court may make an order vacating the award ... [w]here there was evident partiality ... *in the arbitrators, or any of them* [.]" (Emphasis added.)) *with* HRS § 658A–23(a)(2)(A) ("[T]he court shall vacate an award ... if ... [t]here was ... [e]vident partiality *by an arbitrator appointed as a neutral arbitrator* [.]") (Em-

phasis added.). The legislative history, however, is silent as to any intentional distinction between neutral and party-appointed arbitrators for purposes of a motion to vacate an arbitration award based on "evident partiality." *See supra* note 1 and discussion *infra* with respect to the Commentary to the UAA.

**14.** The circuit court cites only to Code of Ethics Canon II in its COLs, thereby drawing no distinction between party-appointed and neutral arbitrators for purposes of the duty to disclose.

arbitrator. For purposes of this code, an arbitrator appointed by one party who is not expected to observe all of the same standards as the third arbitrator is called a "nonneutral arbitrator." This Canon VII describes the ethical obligations that nonneutral party-appointed arbitrators should observe and those that are not applicable to them.

In all arbitrations in which there are two or more party-appointed arbitrators, it is important for everyone concerned to know from the start whether the party-appointed arbitrators are expected to be neutrals or nonneutrals. *In such arbitrations, the two party-appointed arbitrators should be considered nonneutrals unless both parties inform the arbitrators that all three arbitrators are to be neutral or unless the contract, the applicable arbitration rules, or any governing law requires that all three arbitrators be neutral.*

. . . .

A. *Obligations under Canon I*

Nonneutral party-appointed arbitrators should observe all of the obligations of Canon I to uphold the integrity and fairness of the arbitration process, subject only to the following provisions.

1. Nonneutral arbitrators may be predisposed toward the party who appointed them but in all other respects are obligated to act in good faith and with integrity and fairness. . . .

B. *Obligations under Canon II*

Nonneutral party-appointed arbitrators should disclose to all parties, and to the other arbitrators, all interests and relationships which Canon II requires be disclosed. Disclosure as required by Canon II is for the benefit not only of the party who appointed the nonneutral arbitrator,

but also for the benefit of the other parties and arbitrators so that they may know of any bias which may exist or appear to exist. *However, this obligation is subject to the following provisions.*

1. Disclosure by nonneutral arbitrators should be sufficient to describe *the general nature and scope of any interest or relationship, but need not include as detailed information as is expected from persons appointed as neutral arbitrators . . . .*

(Emphases added.) "The fact that party selected arbitrators are not expected to be 'neutral,' however, does not mean that such arbitrators are excused from their ethical duties and the obligation to participate in the arbitration process in a fair, honest[,] and good-faith manner." *Metro. Prop. and Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F.Supp. 885, 892 (D.Conn.1991) (recognizing the Code of Ethic's distinction between a nonneutral party-appointed arbitrator's and a neutral arbitrator's duty to disclose conflicts of interest and, nevertheless, holding that the nonneutral party-appointed arbitrator's failure to disclose, *inter alia*, his *ex parte* communication with the appointing party regarding the merits of its case prior to his appointment violated the AAA's Code of Ethics). Insofar as the arbitration clause set forth in the Lease did not mandate that the party-appointed arbitrators were to act as "neutral" arbitrators, we view, consistent with Code of Ethics Canon VII, Swope as a "nonneutral" party-appointed arbitrator and therefore subject to the standard of disclosure delineated in Canon VII(B)(1).[15]

Likewise, the Commentary to the Uniform Arbitration Act (UAA) (2001) [hereinafter, "Commentary"],[16] drafted by the National Conference of Commissioners on Uniform State Laws, recognizes a distinction between the disclosure requirements applicable to

---

**15.** The circuit court's FOF No. 22 does not alter our view that Swope was a "nonneutral" party-appointed arbitrator. In that FOF, the circuit court stated in relevant part that, "[d]uring the arbitration hearings, Mr. Swope had been given lead responsibility among the arbitrators for addressing legal and evidentiary issues. . . ." Inasmuch as an arbitrator appointed to a tripartite panel must disclose any conflicts of interest with the parties *prior to the commencement of the*

*arbitration,* the extent of Swope's participation during the actual arbitration proceeding is irrelevant to the ethical standards to which he was subject for purposes of disclosure.

**16.** As mentioned *supra* in note 1, the UAA, as codified in HRS chapter 658A, was not in effect at the time of the arbitration proceeding at issue in the present matter.

"party-appointed" and "neutral" arbitrators. With respect to the disclosure requirements set forth in section 12 of the UAA, which is identical to HRS § 658A–12, *see supra* note 5, the Commentary states the following:

> Special problems are presented by tripartite panels involving non-neutral arbitrators[,] that is, in situations such as where each of the arbitrating parties selects an arbitrator and a third, neutral arbitrator is jointly selected by the arbitrators chosen by the parties. In some such cases, it may be agreed that the arbitrators chosen by the parties are not regarded as neutral arbitrators, but are deemed to be predisposed toward the party which appointed them. However, in other situations even the arbitrators appointed by the parties may have a duty of neutrality on some or all issues. The integrity of the process demands that the non-neutral arbitrators chosen by the parties, like neutral arbitrators, disclose pertinent interests and relationships to all parties as well as other members of the arbitration panel.... Thus, Section 12(a) and (b) apply to non-neutral arbitrators but under a reasonable person standard for someone in the position of a party and not a neutral arbitrator.
>
> Section 12(c) and (d) also apply to non-neutral arbitrators but with a somewhat different effect than to a neutral arbitrator. For example, an undisclosed substantial relationship between a non-neutral arbitrator and the party appointing that arbitrator may be the subject of a motion to vacate under Section 23(a)(2). However, *an award would be vacated only where a non-neutral arbitrator fails to disclose information that amounts to corruption or to misconduct prejudicing the rights of a party under Section 23(a)(2)(B) and (C). The ground of evident partiality in Section 23(a)(2)(A) by its terms only applies to an arbitrator appointed as a neutral arbitrator and it would not make sense to apply this ground to a non-neutral arbitrator whose function in many arbitration settings is to be an advocate for one of the parties.*

Commentary at 48–49 (emphasis added).

In *Ad–Med, Inc. v. Bruce J. Iteld, M.D.*, 728 So.2d 556, 557 (La.Ct.App.1999), Iteld, the losing party to an arbitration proceeding, filed a motion to vacate the arbitration award, pursuant to a statutory provision virtually identical to the former HRS § 658–9, on the grounds that Ad–Med's party-appointed arbitrator failed to disclose his ongoing attorney-client relationship with the president and sole shareholder of Ad–Med. The Louisiana Court of Appeals held, as a matter of law, that the undisclosed conflict did not constitute evident partiality, warranting disqualification as a party-appointed arbitrator. *Id.*

Our reading of the Rules of the American Arbitration Association, the two codes of ethics offered by ... Iteld, and the jurisprudence in this area, does not lead us to the same expectation of impartiality in party-appointed, non-neutral arbitrators as is contended by Iteld:

> It would be strange indeed if an interested party, with the right to select an arbitrator, would select one antagonistic to it. An arbitrator selected by one of the contesting parties, is effectually an advocate of such party. The third party mutually selected by them is expected to be the impartial and final judge.

*Id.* at 559 (citation omitted); *see also Sunkist Soft Drinks, Inc.*, 10 F.3d at 760 ("[A] party-appointed arbitrator is permitted, and should be expected, to be predisposed toward the nominating party's case."); *Stef Shipping Corp. v. Norris Grain Co.*, 209 F.Supp. 249, 253–54 (S.D.N.Y.1962) ("The fact that [a party-appointed arbitrator] consulted with his nominator prior to the arbitration hearing is not shocking.... This is not the type of irregularity which [9 U.S.C. § 10] contemplates as being sufficient to vacate an otherwise valid arbitration award.").

Notwithstanding a party-appointed or neutral arbitrator's duties to investigate the presence of any conflicts of interest with the parties to an arbitration proceeding and to disclose them to the parties, the well accepted rule in arbitration cases is that a party who fails to raise a claim of partiality against an arbitrator prior to or during the arbitration proceeding is deemed to have

waived the right to challenge the decision based on "evident partiality." [17] In the arbitration context, waiver "has been defined as consisting of knowledge, actual or constructive, in the complaining party of the tainted relationship or interest of the arbitrator" and the failure to act on that knowledge. *Gordon Sel–Way, Inc. v. Spence Brothers, Inc.*, 177 Mich.App. 116, 440 N.W.2d 907, 909–910 (1989), rev'd on other grounds, 438 Mich. 488, 475 N.W.2d 704 (1991) (citation omitted).

A respectable number of federal jurisdictions have invoked the waiver principle under circumstances in which the complaining party knew or should have known of the potential partiality of an arbitrator but failed to raise an objection to the arbitrator's appointment prior to the arbitration decision. *See JCI Communications, Inc. v. International Bhd. of Elec. Workers, Local 103*, 324 F.3d 42, 52 (1st Cir.2003) (holding that a party, "which was put on notice of the risk when it signed the contract [and] chose not to inquire about the backgrounds of the Committee members either before or during the hearing," waived the right to challenge the arbitration decision based on "evident partiality"); *Delta Mine Holding Co.*, 280 F.3d at 821 ("Even when a neutral arbitrator is challenged for evident partiality, the issue is deemed waived unless the objecting party raised it to the arbitration panel."); *Kiernan v. Piper Jaffray Cos., Inc.*, 137 F.3d 588, 593 (8th Cir.1998) ("While they did not have full knowledge of all the relationships to which they now object, they did have concerns about [the arbitrator's] partiality and yet chose to have her remain on the panel rather than spend time and money investigating further until losing the arbitration."); *Early v. Eastern Transfer*,

699 F.2d 552, 558 (1st Cir.1983) ("[W]e will not entertain a claim of personal bias where it could have been but was not raised at the hearing to which it applies. This is the accepted rule in arbitration cases."); *United Steelworkers of America Local 1913 v. Union R.R. Co.*, 648 F.2d 905, 913 (3d Cir.1981) ("When the reasons supporting an objection are known beforehand, a party may not wait to make an objection to the qualifications of a Board member until after an unfavorable award has been made."); *Cook Indus., Inc. v. C. Itoh & Co., Inc.*, 449 F.2d 106, 107–08 (2d Cir.1971) ("Appellant cannot remain silent, raising no objection during the course of the arbitration proceeding, and when an award adverse to him has been handed down complain of a situation of which he had knowledge from the first."); *Garfield & Co. v. Wiest*, 432 F.2d 849, 854 (2d Cir.1970) ("[W]hen parties have agreed to arbitration with full awareness that there will have been certain, almost necessary, dealings between a potential arbitrator and one of the opposing parties, disclosure of these dealings is not required by *Commonwealth Coatings* in as much as the parties are deemed to have waived any objections based on these dealings."); *Behring Int'l, Inc. v. Local 295 Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 449 F.Supp. 513, 517–18 (E.D.N.Y.1978) (concluding that the complaining party's "continued participation in the arbitration proceedings without raising a challenge to [the arbitrator's] dual status as arbitrator and trustee, after [the arbitrator] had disclosed his position as trustee, must be deemed a waiver of any objection to the award based on . . . partiality").[18]

17. Generally, waiver is defined as an intentional relinquishment of a known right, a voluntary relinquishment of rights, and the relinquishment or refusal to use a right. *Association of Owners of Kukui Plaza v. Swinerton & Walberg Co.*, 68 Haw. 98, 108, 705 P.2d 28, 36 (1985). To constitute a waiver, there must have existed a right claimed to have been waived and the waiving party must have had knowledge, actual or constructive, of the existence of such a right at the time of the purported waiver. *Honolulu Fed. Sav. & Loan Ass'n v. Pao*, 4 Haw.App. 478, 484, 668 P.2d 50, 54 (1983); *In re Estate of Searl*, 72 Haw. 222, 226–27, 811 P.2d 828, 831 (1991) (citations omitted). While the question whether a valid waiver exists is generally a question of

fact, "when the facts are undisputed it may become a question of law." *Hawaiian Homes Comm'n v. Bush*, 43 Haw. 281, 286 (1959) (citations omitted); *see also Stewart v. Spalding*, 23 Haw. 502, 517 (1916) ("The question of waiver is usually a mixed one of law and fact . . ., but where the facts are undisputed and are susceptible of but one reasonable inference it becomes one of law for the court." (Citations omitted.)).

*Coon v. City and County of Honolulu*, 98 Hawai'i 233, 261–62, 47 P.3d 348, 376–77 (2002).

18. By contrast, some federal jurisdictions require *actual* knowledge of an arbitrator's potential partiality on the part of the complaining party prior to the arbitration proceeding as foundational to

In *Gordon Sel–Way, Inc.*, the defendant filed a motion to vacate an arbitration award on the ground that the failure of one of the arbitrators to disclose that he had filed a lawsuit on behalf of his consulting firm against the defendant constituted "evident partiality." 440 N.W.2d at 909. Prior to the commencement of the arbitration proceeding, the arbitrator, Charles Scales, disclosed his status as the president of Scales & Associates but failed to disclose that, in 1984, he had initiated a lawsuit against the defendant and its subcontractor on behalf of Scales & Associates to recover monies owed to the consulting firm; the matter was settled two months later after the defendant sent a joint check for the outstanding balance due and owing to the subcontractor and the consulting firm. *Id.* at 909–10. It was undisputed that "at least two agents of the defendant had knowledge of the prior relationship between the defendant and Charles Scales in his status[ ] as agent for the consulting firm." *Id.* at 911. The Michigan Court of Appeals affirmed the trial court's decision to impute the knowledge of the defendant's agents to the defendant and concluded that the defendant's failure to object to Scales' alleged partiality constituted a waiver. *Id.*

"[A] corporate agent will not be allowed by law to shut his or her eyes to the knowledge imputed to the corporation, but is required to carry out his or her duties in light of that knowledge even if the individual involved did not have personal knowledge of the fact in dispute." *Id.* at 912.

The fact that the individual agents of the defendant may not have personally connected Scales' name to the prior lawsuit until after the arbitration award was entered does not mandate a different conclusion. Even where there are changes in a corporation's personnel, *i.e.*, a new president is appointed, a corporation, once charged with knowledge of a particular transaction or event, continues to be affected by such knowledge.

*Id.* at 911–12 (citations omitted).

■ We hold that Daiichi's failure in the present matter to challenge Swope's alleged partiality prior to or during the arbitration proceeding constituted a waiver of the issue for purposes of a post-arbitration motion to vacate the arbitration decision. It is undisputed that, upon his appointment by the trustees, Swope contacted the documents department at CSF & W in order to investigate his prior involvement with the trustees, or any of them or any trustees-related persons or entities. When CSF & W informed Swope that the files had been purged and no longer existed, Swope relied on his own recollection to disclose any conflicts of interest with respect to the subject property in the SA. Consequently, we disagree with Daiichi that Swope violated his duty to investigate his prior dealings with the trustees, inasmuch as, at the time of his disclosure, the only entity in possession of the April 9, 1990 letter—*i.e.*, the letter upon which Daiichi based its motion to vacate—was Daiichi. Surely, Swope's duty to investigate any conflicts of interest between himself and the trustees did not encompass a "fishing expedition" of Daiichi's lease files.

■ Moreover, we believe that Swope, nominated by the trustees as a nonneutral party-appointed arbitrator, satisfied his duty to disclose as expressed in Code of Ethics Canon VII(B)(1). The record reflects that Swope disclosed the "general nature and scope" of his attorney-client relationship with the trustees with respect to the subject property. In particular, Swope set forth in the

---

waiver. *See Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1359 (6th Cir.1989) (affirming the district court's conclusion that, "as a general rule, a grievant must object to an arbitrator's partiality at the arbitration hearing before such an objection will be considered by the federal courts" but highlighting that "[t]he successful party . . . may not rely on the failure to object for bias . . . unless '[a]ll the facts now argued as to [the] alleged bias were known . . . at the time the joint committee heard their grievances' ") (some brackets added and some in original); *Middlesex*

*Mut. Ins. Co. v. Levine*, 675 F.2d 1197, 1204 (11th Cir.1982) ("Waiver applies only where a party has acted with full knowledge of the facts."); *HSMV Corp.*, 72 F.Supp.2d at 1131 (" 'Clearly, as a threshold matter[,] one must know of, understand[,] and acknowledge the presence of a conflict of interest before one can' waive the conflict.") (Citation omitted.). Insofar as this court has consistently recognized waiver based on either actual or constructive knowledge, we rely on the jurisdictions referenced in the text of this opinion.

SA that he had reviewed a standard form consent document relating to the subject property but that his review of the document did not involve any valuation of the property, precisely the subject matter at issue in the arbitration proceeding. Contrary to the circuit court's COL No. 8, Swope's disclosure in the SA was not a "discrete and minor representation"; rather, Swope's rendering of legal services in connection with the subject property was a *material* disclosure, such that the failure to have made it would necessarily have constituted "evident partiality" absent a waiver based on actual or constructive knowledge of the conflict of interest. In fact, as we have noted, Yamamura testified that he had informed Matsushita that, based on Swope's disclosure in the SA, Daiichi could object to Swope's appointment on the ground that Swope "might not be able to be an impartial arbitrator" due to his duty of loyalty as counsel for the trustees; Daiichi, however, knowingly declined to object to Swope's appointment at that time. We acknowledge that Swope should have erred on the side of disclosure by revealing in greater detail his longstanding relationship with the trustees and various trustees-related individuals and entities. Nevertheless, Daiichi was fully cognizant at the time it executed the SA that Swope and the trustees had a prior attorney-client relationship with respect to the subject property. Thus, inasmuch as Daiichi had actual knowledge of Swope's prior attorney-client relationship with the trustees with respect to the subject property, Daiichi, by failing to raise an objection to Swope's appointment as an arbitrator prior to or during the arbitration proceeding, waived its right to challenge the propriety of the arbitration decision on grounds of "evident partiality."

Finally, assuming *arguendo* that Swope's failure to disclose the April 9, 1990 letter, written by Swope to KC with respect to the subject property, violated his duty to disclose under the Code of Ethics, we believe that Daiichi was charged with constructive knowledge of the letter—which was, after all, contained in its own files—and that Daiichi therefore waived any right to challenge the arbitration decision based on Swope's failure to disclose the letter. *See Gordon Sel–Way, Inc.*, 440 N.W.2d at 911 ("The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents ... acquire[ ] while acting under and within the scope of their authority.") (Quoting *Copeman Labs. Co. v. General Motors Corp.*, 36 F.Supp. 755, 762 (E.D.Mich.1941)). As we have said, Matsushita and Wolff conceded in the course of the hearing on Daiichi's motion to vacate the arbitration decision that Daiichi had possessed the letter in its lease files but had failed to review the consent document because Daiichi believed that Swope's prior involvement would not affect the discharge of his duties as an arbitrator. Moreover, Matsushita acknowledged that it was only after the arbitration decision that Daiichi's attorneys requested that he "look through [the] lease files to see if [he] could find something that might indicate that Mr. Swope was more involved in representing [the trustees]" than Swope had disclosed in the SA and that, upon review of the arbitration decision, Daiichi "wanted to find some way to change the result of the arbitration." *Hobet Mining, Inc. v. Int'l Union, United Mine Workers of Am.*, 877 F.Supp. 1011, 1019 (S.D.W.Va.1994) ("[W]here information about an arbitrator is not known in advance, but could have been ascertained by more thorough inquiry or investigation, a post-award challenge suggests that nondisclosure is being raised merely as a 'tactical response to having lost the arbitration' or an inappropriate attempt to seek a 'second bite at the apple' because of dissatisfaction with the outcome.") (Citations omitted.). We cannot endorse Daiichi's "wait and see" approach to challenging the arbitration decision based on information in its possession prior to the arbitration proceeding and after it had been placed on actual notice of Swope's attorney-client relationship with the trustees.

While it may be unpleasant to have to choose between possibly alienating a decisionmaker in advance by objecting and waiving the issue of bias, we cannot accept that parties have a right to keep two strings to their bow—to seek victory before the tribunal and then, having lost, seek to overturn it for bias never before claimed.

*Early,* 699 F.2d at 558.[19]

Furthermore, the circuit court studiously omitted from its FOFs and COLs any reference to the April 9, 1990 letter from Swope or, more importantly, Daiichi's constructive knowledge of the April 9, 1990 letter by virtue of Daiichi's possession of it prior to the arbitration proceeding.[20] Moreover, the circuit court erred in relying solely on Code of Ethics Canon II, thereby overlooking the critical language of Canon VII(B)(1), pertaining to nonneutral party-appointed arbitrators such as Swope. In light of the foregoing analysis, we hold that the circuit court's COL No. 8 wrongly concluded that "the disclosure in this case was insufficient to shift the burden to Daiichi to investigate or to constitute a waiver of any challenge."

## IV. CONCLUSION

Accordingly, we vacate the circuit court's findings of fact, conclusions of law, and order granting Daiichi's motion to vacate the arbitration decision, filed on February 18, 2000, and instruct the circuit court to reinstate the arbitration decision dated September 12, 1999.[21]

## Dissenting Opinion of ACOBA, J.

I would affirm the findings of fact, conclusions of law, and the February 18, 2000 order by the first circuit court (the court) granting the motion of Lessee–Appellee Daiichi Hawai'i Real Estate Corporation (Daiichi) to vacate the arbitration decision on a finding of evident partiality, Hawai'i Revised Statute (HRS) § 658–9(2) (1993).[1] As an arbitrator, William M. Swope (Swope) had a duty to disclose the extensive relationship he had with Lessor–Appellant Lichter,[2] one of the parties to the arbitration. Daiichi had a right to rely on Swope's June 22, 1999 disclosure, and when a disclosure is inadequate and misleading the arbitration award should be set aside, as the court held. Plainly, Daiichi did not have actual knowledge of the wide-ranging personal and professional relationship between Swope and Lichter, nor in light of the misleading nature of the disclosure could Daiichi be justly charged with constructive notice of evident partiality. Moreover, there can be no distinction made between party-appointed arbitrators and neutral arbitrators with regard to disclosure, as the majority holds, because it is not supported by statute, the agreement, or the application of the code, in this case. The court's findings were supported by the evidence, and following fundamental tenets of review, we must affirm the court inasmuch as its findings were not clearly erroneous or mistaken and led irrefragably to its conclusions of law and ultimate order.

19. The dissent contends that Swope's disclosure in the SA was "inadequate and misleading." Consequently, the dissent argues that Daiichi, lacking both actual and constructive knowledge of the extent of Swope's relationship with the trustees (primarily Dr. Lichter), could not have waived its right to challenge the arbitration decision based on "evident partiality." Inasmuch as the Code of Ethics mandated that Swope, a nonneutral party-appointed arbitrator, disclose only the "general nature and scope" of his relationship with the parties—*i.e.*, his attorney-client relationship with the trustees with respect to the subject property—we disagree that his disclosure in the SA was insufficient to charge Daiichi with actual and constructive knowledge for purposes of waiving its right to challenge the arbitration decision in the present matter.

20. We agree with the dissent that the circuit court's FOFs were not clearly erroneous. The circuit court's COL No. 8, however, was wrong as a matter of law, inasmuch as the circuit court failed to apply correctly the law with respect to waiver as it relates to Swope's duty to disclose as a nonneutral party-appointed arbitrator. In oth-

er words, Swope sufficiently disclosed his relationship with the trustees pursuant to Code of Ethics Canon VII(B)(1), and, thus, Daiichi's failure to object to Swope's appointment prior to the arbitration proceeding constituted a waiver of its right to do so post-award.

21. In light of our disposition, we need not, and do not, address the trustees' remaining points of error.

1. HRS § 658–9 states in relevant part that "the court may make an order vacating the award, upon the application of any party to the arbitration: ... (2) Where there was evident partiality or corruption in the arbitrators, or any of them[.]"

2. "Lichter" includes Rowlin L. Lichter, M.D., individually, and Rowlin L. Lichter, Linda Maile Harris, and Marcy Friedman as Trustees of the Martin H. Lichter Education Trust, as appropriate.

## I.

It is a fundamental proposition that Swope had a duty to disclose the extent of his relationship with Lichter. In that regard, "conflicts of interest arising from *personal, professional,* and business relationships between the arbitrator and a party ... [are] indications of partiality." *Salud v. Fin. Sec. Ins. Co.,* 7 Haw.App. 329, 333, 763 P.2d 9, 11–12 (1988)[3] (emphasis added) (citing *Commonwealth Coatings Corp. v. Continental Cas. Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)). Thus, to avoid a charge of evident partiality an arbitrator must disclose "to the parties any dealings that might create an impression of possible bias." *Commonwealth Coatings,* 393 U.S. at 149, 89 S.Ct. 337. Indeed, in Commonwealth Coatings the Court stated that "any tribunal [such as an arbitration board] permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." *Id.* at 150, 89 S.Ct. 337. Accordingly, the parties to an arbitration have a right to rely on the arbitrator's disclosure.

The evidence uncovered at the court hearing on December 16, 1999 is a strong indictment of the tainted award rendered by the arbitrators.[4] Based on such evidence the court found that: (1) Swope "never disclosed that he and his law firm had a 14–year long attorney-client relationship with Dr. Lichter and eight other various Lichter entities" (findings of fact (finding) 8) (2) Swope "never disclosed that he and his law firm had worked on at least 12 different matters for Dr. Lichter [Rowlin L. Lichter, M.D. (Dr.

Lichter)] and the Lichter entities; (3) Swope "never disclosed that as far back as 1989, he considered Dr. Lichter to be a 'friend and neighbor' "; (4) Swope "never disclosed that he represented Dr. and Mrs. Lichter on the sale of their personal residence"; (5) Swope "never disclosed that he had represented Dr. Lichter in the corporate management of [Dr. Lichter's] company as far back as 1989"; (6) Swope "never disclosed that as much as ten years earlier he had worked as co-counsel with Morton L. Friedman, Esq.,[5] [Lichter's counsel at the arbitration hearing] with respect to the party's trust matters, the lease in question, and the property involved in the arbitration"; (7) Swope "never disclosed that he had been retained by Dr. Lichter to represent Dr. Lichter's son-in-law in a business dispute involving court litigation"; (8) Swope "never disclosed that he had represented Dr. Lichter in the conveyance of real property as a charitable donation to the Sierra Nevada College"; (9) Swope "never disclosed that he served as the primary lawyer in his law firm for matters relating to Dr. Lichter and that at least six other attorneys in his law firm had also rendered legal services on behalf of Dr. Lichter and Lichter entities"; and (10) Swope "never disclosed that an attorney-client privilege [6] between [Swope's] law firm and the Lichter Trust subsists even to the present day." Swope was duty-bound to disclose this extensive personal and professional relationship with Lichter, but, as found by the court, never did.

The court also found that Swope's actions during the arbitration and court proceedings furthered the nondisclosure, finding that: (1) "[a]t a site inspection prior to the arbitration

---

3. Although in *Salud* the nature of the evident partiality was for possible actual bias regarding an alleged "misrepresent[ation of] the medical evidence[,]" the Intermediate Court of Appeals (ICA) directly applied the holding in *Commonwealth Coatings,* a case involving possible bias stemming from nondisclosure of a conflict of interest. *Salud,* 7 Haw.App. at 336, 763 P.2d at 13. The ICA noted that a "showing of any conflict of interest arising from a personal, professional, or business relationship between the arbitrator and FSIC[, the party], its counsel, principal, or agent, or from the arbitrator having any financial interest in the outcome of the arbitration" under HRS § 659–9(2) was required for a court to find evident partiality. *Id.*

4. The court said in finding 22 that, "[d]uring the arbitration hearings, Mr. Swope *had been given lead responsibility among the arbitrators for addressing legal and evidentiary issues* .... These rulings were not rendered in favor of Daiichi." (Emphasis added.)

5. Morton L. Friedman is a California attorney who represented the Lichter Trust at the arbitration hearings. He was also the individual who appointed Mr. Swope as an arbitrator on behalf of the Lichter Trust.

6. Attorney-client privilege entails a duty of confidentiality on the part of the attorney regarding confidences revealed in the course of representing a client.

hearings, Mr. Swope, Mr. Friedman, and Dr. and Mrs. Lichter portrayed themselves in a business like manner but not as friend and neighbor" (finding 23); (2) "[m]oreover, at the arbitration hearings, Mr. Swope, Mr. Friedman, and Dr. Lichter portrayed themselves as cordial *but unknown to each other*" (finding 24) (emphasis added); (3) "Mr. Friedman and Dr. Lichter, both of whom were present throughout the arbitration hearings, knew that Mr. Swope and his law firm had represented many Lichter entities repeatedly over the preceding 14-year period" (finding 25); (4) "[a]s late as October 8, 1999, Lichter Trust maintained that Mr. Swope wrote only one letter for the Lichter Trust approximately nine and one-half years prior to the arbitration. Lichter Trust's Memorandum in Opposition to Motion to Vacate, filed October 8, 1999, p. 7" (finding 27); and (5) "Lichter Trust maintained that position [as stated in finding 27] during oral argument at the October 19, 1999 hearing on Daiichi's Motion to Vacate" (finding 28).

## II.

The entirety of Swope's disclosure, the June 22, 1999 Submission Agreement (SA) and the attached supplemental disclosure statement,[7] failed to recount the wide-ranging representation Swope had afforded Lichter. Swope's June 22, 1999 SA which stated that Swope "did render legal services for Rowlin L. Lichter, M.D., *that consisted* of a

review of a standard form of consent document," (emphasis added) fell woefully short of revealing the relationship recounted above. In fact, it implied that the relationship was limited to a particular incident.

Consequently, the court found, based on the disclosure, that Daiichi "reasonably believed" that the work done by Swope for Lichter were "specifically limited to a very narrow matter, narrow issue, narrow task, all written in the past tense[,] . . . an isolated instance in the past[,]" (finding 7). Allen R. Wolff, (Wolff), Daiichi's attorney, explained that if he had known the information established by the 1,500 pages of produced documents, he would have asked for a further and complete disclosure from Swope. The court in its finding 6 reiterated that "Daiichi believed that on the basis of the disclosure, the work that Mr. Swope did for Dr. Lichter in the past was minimal." Had Daiichi known the full extent of Scope's relationship, the court found in finding 30 that "Daiichi would have sought Mr. Swope's disqualification from serving as an arbitrator if, prior to the arbitration, the extent of his involvement and his law firm's involvement with Mr. Friedman, Dr. Lichter, Lichter Trust or the other Lichter entities had been disclosed."

## III.

It would appear evident that a complete disclosure of possible conflict by an arbitra-

---

7. The disclosure in its entirety consisted of (1) a June 22, 1999 SA which stated that

> Mr. Swope disclosed that he did render legal services for Rowlin L. Lichter, MD, *that consisted of a review of a standard form of consent* document either in connection with an assignment of lease or for a mortgage lender in connection with the property in question. An issue of valuation was not involved. Mr. Swope recall that the documents being prepared by other legal counsel and he was asked to approve the documents as to form and content.
>
> Mr. Swope has made a Supplemental Disclosure Statement that is attached and made a part of this agreement[,]

and (2) the Supplement Disclosure Statement that disclosed as follows:

> This Supplemental Disclosure Statement is submitted in response to the letter of May 3, 1999, from Carlsmith Ball wherein the law firm seeks additional disclosures from me due to its comment that Cades Schutte Fleming & Wright may have previously represented Daii-

chi Finance Corporation, an affiliate of the lessee.

1. William M. Swope is no longer active in the practice of law; rather he is Of Counsel to the Cades law firm.
2. He has never worked on any legal matter involving Daiichi Finance Corporation.
3. Following receipt of the Carlsmith Ball letter identified above, he has only recently been informed that other attorneys in the Cades firm may have handled legal matters involving Daiichi Finance Corporation and that such matters may have covered acquisitions, loans, and condominium projects, but that none of such matters had anything to do with the valuation of property at 1776 Kapi'olani Blvd.
4. He has had no involvement of any kind, nor has he received any information of any kind regarding Daiichi Finance Corporation except that he only discovered that others had worked on matters as described in the above paragraph 3 as a result of the letter form Carlsmith Ball identified above.

tor is necessary because "[t]he *parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed.*" *Schmitz v. Zilveti,* 20 F.3d 1043, 1047 (9th Cir.1994) (emphasis added). Therefore, "an arbitrator's nondisclosure of facts showing a potential conflict of interest *creates evident partiality warranting vacatur even when no actual bias is present.*" *Id.* at 1045 (emphasis added).

In *Schmitz,* the United States Court of Appeals for the Ninth Circuit applied the *Commonwealth Coatings* interpretation of "evident partiality" as set forth in 9 U.S.C.A. § 10(a)(2) [8] on nondisclosure cases. Reversing the United States District Court for the District of Hawai'i, the Ninth Circuit held that an arbitrator, who failed to disclose that his law firm had several times represented a parent company of the appellee, was "evidently impartial." Thus, the arbitration award was subject to vacatur even though the arbitrator did not know, at the time of the arbitration, of his law firm's relationship with appellee's parent company. *Id.* at 1044–45. The Ninth Circuit specifically held that, "[i]n a nondisclosure case, the integrity of the process by which arbitrators are chosen is at issue. *Showing a 'reasonable impression of partiality' is sufficient in a nondisclosure case* [to warrant vacatur of an award] because the policy of section 10(a)(2) instructs that the parties should choose their arbitrators intelligently." *Id.* at 1047 (emphasis added) (citing *Commonwealth Coatings,* 393 U.S. at 151, 89 S.Ct. 337 (White, J., concurring)). In the instant case, the facts enumerated above that were not disclosed by Swope lead objectively to a "reasonable impression of partiality[.]" *Id.* at 1045. The "evident partiality" demonstrated on the record compromises the "integrity of the process" by which the arbitrators were chosen. *Id.*

### IV.

While acknowledging *Commonwealth Coatings,* the majority relies on cases which do not support the majority's contention that Swope satisfied his duty to disclose as articulated in *Commonwealth Coatings.* Majority opinion at 341–342, 82 P.3d at 427–428. *Morelite Constr. Corp. v. New York City District Council Carpenters Benefit Funds,* 748 F.2d 79, 80 (2d Cir.1984), is inapplicable because it does not deal with a failure to disclose. Moreover, the case simply held that a father-son relationship would make an arbitrator evidently partial, a proposition that seems undisputable. In our case a similar close relationship warrants vacatur. In *Peabody v. Rotan Mosle, Inc.,* 677 F.Supp. 1135 (M.D.Fla.1987), it was held that where an *expert witness* did work for the arbitrator's former law partner's mother and brother, this relationship did not rise to the level of evident partiality. In our case, the party and the arbitrator had a professional relationship that spanned fourteen years. In *Washburn v. McManus,* 895 F.Supp. 392 (D.Conn.1994), it was ruled that the fact that the arbitrator was a plaintiff in an unrelated lawsuit against his former employer at the time of the arbitration of a similar type of case did not demonstrate evident partiality. The court held that the similarities between the arbitrated claim of the party-employee against his former employer and the arbitrator's claim against his former employer were too superficial to evidence any bias. *Id.* at 400. Contrastingly, there was a significant relationship in the instant case. The contrast between Swope and Lichter's fourteen-year relationship and the relationship involved in the *Washburn* case is obvious.

### V.

Unquestionably, Swope did not make a full disclosure of his relationship with Lichter. Swope's claim that his disclosure was based on recollection and the reference to his review of a consent form were plainly insufficient to reveal the facts uncovered by the court "showing a potential conflict of interest." *Schmitz,* 20 F.3d at 1045.

The majority relies on Swope's contention that he attempted to make the proper disclosure by requesting files from his former law firm, but was told that those files were de-

---

**8.** As Hawai'i's arbitration code, HRS chapter 658–9(2), is modeled after the Federal Arbitration Act, 9 U.S.C. § 10, this court has looked to federal interpretation of "evident partiality" to inform its own interpretation. *See* majority opinion at 339, 82 P.3d at 425.

stroyed. Majority opinion at 347, 82 P.3d at 433. Thus, Swope had to rely on his own recollection. *Id.* But, the court, which listened to and observed Swope's testimony, expressed skepticism about the candidness of this representation, concluding in Conclusion 22 that "Mr. Swope was obligated to make a *full and candid disclosure.* Although Mr. Swope attempted to conduct a conflicts check without success, the *extent of legal representation over a 14 year period overshadows his claim that the disclosure represented the full extent of his independent recollection.*" (Emphases added)

Here, if Swope had initially disclosed the relationship he had with Lichter, then Daiichi would have been able to intelligently assess whether Swope should be retained as an arbitrator. As the court found, it would have exercised its prerogative prior to the hearing to challenge Swope. In the absence of full disclosure, Daiichi was denied the opportunity to object to Swope. As the court concluded in Conclusion 17, "[i]t is inadequate for a lawyer or arbitrator to claim that he did not remember the representations. 'That the lawyer forgot to run a conflict check or had forgotten that he had previously represented the party is not an excuse.' *Schmitz,* 20 F.3d at 1048 (citing *In re Siegal,* 153 N.Y.S.2d 673 (1956))."

The majority also appears to construe Swope's disclosure of his review of the consent document as a "material disclosure," majority opinion at 347–348, 82 P.3d at 433–434, rendering "Daiichi ... fully cognizant ... that Swope and the trustees had a prior attorney-client relationship with respect to the subject property[.]" majority opinion at 347–348, 82 P.3d at 433–434. Although Daiichi may have been cognizant of Swope's prior attorney-client relationship with regard to the consent form, that revelation could not possibly have put Daiichi on notice of the extensive relationship between Swope and Lichter. The court found, rather, that there were material nondisclosures and conduct during the arbitration and court proceedings intended to maintain an appearance of an arms-length relationship. *See supra* page 350, 82 P.3d page 436.

The unrebutted testimony of Daiichi's Vice–President, Yoichi Matsushita (Matsushita), was that "the nature, scope, and length of time that Mr. Swope and his firm had worked for Dr. Lichter was never disclosed to Daiichi at any point in the arbitration process." Matsushita explained that "the disclosure made by Mr. Swope in the arbitration *did not indicate or imply* the volume of his and his law firm's representation of Dr. Lichter[.]" (Emphasis added). Matsushita and Wolff both testified that had they known the extent of Swope's involvement with Dr. Lichter at the time of the disclosure, they would have objected to his serving on the panel. Thus, the record supports the trial court's conclusion 8 that under the circumstances Swope's disclosure "was insufficient to shift the burden to Daiichi to investigate or to constitute a waiver of any challenge."

### VI.

Because Swope's June 22, 1999 disclosure was of such a limited nature in contrast to the facts, it was misleading. The disclosure stated that the consent document was prepared by other legal counsel, did not deal with an issue of valuation, and that Swope was asked to approve the document as to form and content. As mentioned, such statements suggest that Swope rendered legal services to Lichter *only* on this matter, and *only* in a limited way. Swope, in his supplemental disclosure statement stated that "*[h]e has never worked* on any legal matter involving Daiichi Finance Corporation." (Emphasis added).

The court found in findings 5, 6, and 7(1) that "Daiichi believed that there was nothing in the disclosure that indicated that Mr. Swope was currently the attorney for Dr. Lichter, Lichter Trust, or any of the various related Lichter individuals or entities;" (2) that "Daiichi believed that on the basis of the disclosure, the work that Mr. Swope did for Dr. Lichter in the past was minimal[ ]"; and (3) that "Daiichi *reasonably believed* that the *disclosure, with its limiting words 'that consisted of'* was a complete disclosure and *not a disclosure that was merely representative of the type of things that had been undertaken* by Mr. Swope on behalf of Dr. Lichter or a

Lichter entity." (Emphases added.) Hence, based upon the testimony of the witnesses, the court found that Daiichi was *reasonable in its belief* that the contract between Swope himself and Lichter was "an isolated instance in the past." Such an isolated incident would not put Daiichi on notice of any evident partiality because Daiichi's belief was supported by common understanding that such occasional contact is not unexpected. As the Court in *Commonwealth Coatings* explained, "arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases[.]" 393 U.S. at 148–49, 89 S.Ct. 337. In light of this truism, it was all the more imperative that the disclosure in this case reveal the nature of the relationship between Swope and Lichter.

## VII.

The majority asserts that Daiichi had a " 'wait and see' approach to challenging the arbitration decision." Majority opinion at 348, 82 P.3d at 434. Frivolous or fraudulent post-award challenges must be discouraged.[9] *Id.* But, vacatur in this case would not undermine the objectives of arbitration, but rather, preserve them. There is no way in which "the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias." *Commonwealth Coatings,* 393 U.S. at 149, 89 S.Ct. 337. "If arbitrators err on the side of disclosure, *as they should,* it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award." *Id.* (White, J., concurring) (emphasis added).

The majority ignores the foregoing propositions. Its "wait and see" formulation has no application to the facts here. As the court found, had the requested disclosures been

made, Daiichi would have challenged Swope. The relationships between Swope and Lichter which the court found warranted vacatur, were only uncovered as a result of judicial discovery and the post-award hearings.

## VIII.

Contrary to the majority's holding, Daiichi did not waive its right to challenge the arbitration decision. Majority opinion at 348, 82 P.3d at 434. This court has said that, "[g]enerally, waiver is defined as an intentional relinquishment of a known right." *Coon v. City & County of Honolulu,* 98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002) (quoting *Assoc. of Owners of Kukui Plaza v. Swinerton & Walberg Co.,* 68 Haw. 98, 108, 705 P.2d 28, 36 (1985)). "To constitute a waiver, there must have existed a right or privilege claimed to have been waived and the waiving party must *have had knowledge, actual or constructive, of the existence of such right or privilege at the time of the purported waiver.*" *Honolulu Fed. Sav. & Loan Ass'n v. Pao,* 4 Haw.App. 478, 484, 668 P.2d 50, 54 (1983) (citing 28 Am.Jur.2d Estoppel and Waiver §§ 157, 158 (1966)) (emphasis added). Moreover, a "waiver may be expressed or implied[,] and [i]t may be established by express statement or agreement, *or by acts and conduct from which an intention to waive may be reasonably inferred.*" *Coon,* 98 Hawai'i at 261, 47 P.3d at 376 (emphasis added) (internal quotation marks omitted) (brackets in original).

Under the evidence, Daiichi did not have actual knowledge of the extensive relationship between Swope and Lichter. As stated previously, the court found in finding 8 that Swope did not disclose that he, personally and professionally, and his law firm had maintained a fourteen-year relationship with Lichter and eight other Lichter entities, and that Daiichi believed that on the basis of the disclosure, the work that Mr. Swope did was

---

9. The majority's argument is that Daiichi knew of the potential bias (April 9, 1990 letter evidencing Swope's involvement with subject property and attorney-client relationship with Lichter) prior to the arbitration. The majority contends that Daiichi may not "challeng[e] the arbitration decision based on information in its possession prior to the arbitration proceeding and after it had

been placed on actual notice of Swope's attorney-client relationship with the trustees." Majority opinion at 348, 82 P.3d at 434. Thus, the majority apparently believes that the parties should not be allowed to assert evident partiality, post-award simply on the revelation of a limited past attorney-client relationship with the opposing party. *Id.*

minimal. (finding 6) Thus, Daiichi did not have actual knowledge of the extended relationship between Swope and Lichter.

Additionally, Daiichi did not have constructive knowledge or notice of the relationship between Swope and Lichter. Generally, constructive notice [10] "arise[s] as a legal inference, where circumstances are such that a reasonably prudent person should make inquires, [and, therefore,] the law charges a person with notice of facts which inquiry would have disclosed." *SGM Partnership v. Nelson,* 5 Haw.App. 526, 529, 705 P.2d 49, 52 (1985) (citation omitted) (brackets in original). Here, the circumstances did not give rise to a reasonable basis for further inquiry especially in light of the duty on Swope to disclose [11] "*any* dealings that might create an impression of possible bias." *Commonwealth Coatings,* 393 U.S. at 149, 89 S.Ct. 337 (emphasis added). The court pointed out that pursuant to The Code of Ethics for Arbitrators in Commercial Disputes (Code) of the American Arbitration Association (AAA), arbitrators have an "affirmative duty of disclosure ... [and, thus, a]n Arbitrator should disclose any interest or relationship likely to affect impartiality or which might create an appearance of partiality or bias." Therefore, the majority's holding that Daiichi should be imputed with knowledge of Swope's April 9, 1990 letter revealing an attorney-client relationship with Swope [12] is not instructive.

The critical question is not whether Daiichi knew that there had been an attorney-client relationship between Lichter and Swope because, surely, it did as a result of the disclosure. Rather, Daiichi, as the court found, did not know of the extent of the relationship. Inasmuch as it is a given that arbitrators cannot sever all their ties with the business world, such a disclosure was insufficient under these circumstances. *See Common-*

*wealth Coatings,* 393 U.S. at 148–49, 89 S.Ct. 337. Because Daiichi could reasonably rely on Swope's disclosure, it cannot justly be charged with failing to investigate further.

Hence, Daiichi could not have intentionally waived its right to challenge the arbitration decision. The April 9, 1990 letter would only have made Daiichi aware of the attorney-client relationship between Swope and Lichter as to this particular property. The letter did not evidence the lengthy relationship between Swope and Lichter. Therefore, even if Daiichi were imputed with knowledge of the April 9, 1990 letter, no "intention to waive may be reasonably inferred." *Coon,* 98 Hawai'i at 261, 47 P.3d at 376. The court's decision to vacate the arbitration award based on evident partiality was predicated on the far-reaching relationship between Swope and Lichter, not simply the attorney-client relationship as to the subject property. *Daiichi could not waive what it did not know or would not have reason to know.*

### IX.

Although the majority contends that a distinction should be drawn between party-appointed arbitrators and neutral arbitrators, this proposition is not supported by statute, the agreement, the code itself, or the proceedings herein. Majority opinion at 342–346, 82 P.3d at 428–432. Initially, it is to be noted that neither the parties nor the court raised or considered the application of Canon VII of the Code or any distinction between the arbitrators as "party-appointed arbitrators" or "neutral arbitrators." Accordingly, none of the foregoing was raised in this appeal. Thus, this issue was not before this court.

HRS § 658–9 applies in this case and on its face does not provide for a distinction

---

10. The majority appears to define constructive knowledge as when one "should have known of the potential partiality of the arbitrator[.]" Majority opinion at 346, 82 P.3d at 432.

11. The court concluded that "[a]rbitrators, pursuant to HRS Chap. 658, are duty bound to be impartial and unbiased, doing nothing by which

the rights of a party are prejudiced. HRS 658–9." (conclusion 1)

12. The April 9, 1990 letter from Swope, as representative of the Lessor (Martin H. Lichter, deceased; co-trustees: Rowlin Lobert Lichter; and Linda Maile Harris), to Kapi'olani Capital and Nobuo Kuniyuki set out the rights and duties under the lease.

between a "party appointed arbitrator" and a "neutral arbitrator." *See supra* note 1. Because there was no agreement between the parties to apply HRS chapter 658A (the Uniform Arbitration Act), it is inapplicable. HRS § 658A–3 (Supp.2002).[13] Moreover, the code itself states, in the preamble, that "[t]his *code does not take the place or supersede such agreements, rules, or laws and does not establish new or additional grounds for judicial review of arbitration* [.]" (Emphasis added.) Hence, the Act does not supplant HRS § 658–9. Additionally, the statutory provisions of HRS Chapter 658A (the Uniform Arbitration Act) do not provide a distinction between "party-appointed arbitrators" and "neutral arbitrators" for purpose of determining "partiality." *See supra* note 1.[14] Thus, on its face, no ambiguity exists. *Ross v. Stouffer Hotel Co.,* 76 Hawai'i 454, 461, 879 P.2d 1037, 1044 (1994) (holding that "where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond the language for a different meaning"). Even in the situation where two arbitrators appointed by the parties appoint a third arbitrator, "[t]he *sponsors of th[e] code believe that it is preferable for parties to agree that all arbitrators should comply with the same ethical standards.*" Code, Preamble (Emphasis added.) Therefore, the assertion by the majority that it is *"intuitive reason"* that a party-appointed arbitrator

might view the proceedings through a more subjective and partial lens than a neutral arbitrator[,]" majority opinion at 342, 82 P.3d at 428 (emphasis added), does not comport with the facts under our governing arbitration statute or the preference expressed by the code.

Additionally, the introductory note to Canon VII indicates that such a distinction in treatment must be made at the beginning of the arbitration.[15] There was never any agreement in the lease that Canon VII was to apply. The court took judicial notice of Canon II at the hearing upon the request of Daiichi. No party requested judicial notice of Canon VII. If Lichter sought to apply another standard, then Lichter had the opportunity to request the court do so at that time. It would be unfair in this situation to apply a rule which the parties and the court did not consider. Indeed, Canon II was only one of several authorities on which the court grounded its decision. The court primarily relied on the fact that "Hawai'i has adopted the standard of evident partiality that was set forth in *Schmitz,*" (which had cited *Commonwealth Coatings* ), referring to *Schmitz* in conclusions 4, 5, 6, 7, 11, and 19.

Assuming *arguendo* that Canon VII(B)(1) applies, Swope did not satisfy that requirement of disclosure. The majority relies on

---

**13.** HRS § 658A–3 states in relevant part as follows:

> (b) This chapter governs an agreement to arbitrate made before July 1, 2002, if all the parties to the agreement or to the arbitration proceeding so agree in a record. If the parties to the agreement or to the arbitration do not so agree in a record, *an agreement to arbitrate that is made before July 1, 2002, shall be governed by the law specified in the agreement to arbitrate or, if none is specified, by the state law in effect on the date when the arbitration began* or June 30, 2002, whichever first occurred.

> (Emphasis added).

**14.** Although the majority argues that the commentary to the Uniform Arbitration Act (2001) "recognizes a distinction between the disclosure requirements applicable to 'party-appointed' and 'neutral' arbitrators[,]" majority opinion at 344–345, 82 P.3d at 430–431, the legislative history does not indicate that the commentary to the Uniform Arbitration Act was adopted. Moreover, there is no indication that the parties intended that the arbitrators were to conduct

themselves as anything other than neutral arbitrators.

**15.** The introductory note to Canon VII states in relevant part that:

> In all arbitrations in which there are two or more party-appointed arbitrators, *it is important for everyone concerned to know from the start whether the party-appointed arbitrators are expected to be neutrals or nonneutrals.* In such arbitrations, the two party-appointed arbitrators should be considered nonneutrals unless both parties inform the arbitrators that all three arbitrators are to be neutral or unless the contract, the applicable arbitration rules, or any governing law requires that all three arbitrators be neutral.

> (Emphasis added.) Nothing in the record indicates this matter was even considered by the parties as they all proceeded on the basis that all the arbitrators were to be neutral. The arbitration agreement dated June 22, 1999 even states that the three arbitrators "certify that they are not biased relative to either Party, their agents or representatives."

Canon VII(B)(1) to explain that Swope's disclosure need only be "sufficient to describe the general nature and scope of any interest or relationship, but need not include as detailed information as is expected from person appointed as neutral arbitrators." Majority opinion at 343–344, 82 P.3d at 429–430. Swope did not meet this standard. Swope's disclosure was misleading, as discussed *infra*. Most cases the majority discusses deal with parties who had notice of the distinction between the standard for disclosure between a party-appointed arbitrator and a neutral arbitrator, prior to the arbitration. *See Ad–Med, Inc. v. Bruce J. Iteld, M.D.*, 728 So.2d 556, 558 (La.Ct.App.1999) (applying the rules of the AAA because the arbitration agreement between the parties expressly adopted its application); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 755 (11th Cir.1993) (applying rules of the AAA because expressly adopted in licensing agreement); *Stef Shipping Corp. v. Norris Grain Co.*, 209 F.Supp. 249, 253–54 (S.D.N.Y.1962); [16] *Delta Mine Holding Co. v. AFC Coal Props., Inc.*, 280 F.3d 815, 817 (8th Cir.2001) (applying rules of AAA because lease agreements provided that arbitration be governed by "applicable rules of the American Arbitration Association"); *Washburn*, 895 F.Supp. at 394 (applying the rules of the AAA because arbitration was submitted to the American Arbitration Association for resolution); *Astoria Med. Group v. Health Ins. Plan of Greater New York*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d 85, 86 (1962) (applying rules of AAA because the contract stated that if the third arbitrator could not be decided on, the AAA would select the arbitrator). The only two cases cited by the majority in which the court sua sponte applied the rules of the AAA were in *Metro. Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F.Supp. 885, 892 (D.Conn.1991) and *Aetna Cas. & Sur. Co. v. Grabbert*, 590 A.2d 88 (R.I.1991). In both cases the courts applied the rules of the AAA as "guidance" and both cases found that the

party-appointed arbitrator violated his duty. *Metro. Prop.*, 780 F.Supp. at 891; *Grabbert*, 590 A.2d at 93.

In this case, the parties had the opportunity and undisputed right to object to an arbitrator prior to the arbitration decision. Neither Daiichi nor any party had notice or agreed that a distinction would be applied between a party-appointed arbitrator and a neutral arbitrator. The prerequisites set forth in the Code for distinguishing between party-appointed arbitrators and neutral arbitrators are only meaningful when parties have knowledge of the distinction *before* they arbitrate, not later, on an appeal from a court order pertaining to the award. The record indicates the parties proceeded on the basis that *all* the arbitrators would be neutral, not that two of them could act as nonneutrals.

## X.

On appeal we are to pay due deference to the trial court's findings.

> We review a trial court's [findings of fact] under the clearly erroneous standard. A [finding of fact] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. [A finding of fact] is also clearly erroneous when the record lacks substantial evidence to support the finding. [This court has] defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Beneficial Hawai'i, Inc. v. Kida*, 96 Hawai'i 289, 305, 30 P.3d 895, 911 (2001) (internal quotation marks and citations omitted). Here, the court took evidence and observed the demeanor of the witnesses. This court has held that "[a]n appellate court will not pass upon issues *dependent upon* credibility

---

**16.** Although the majority cites to *Stef Shipping* for the proposition that a party-appointed arbitrator consulting with his nominator prior to the arbitration hearing is not sufficient to vacate an arbitration award, majority opinion at 345–346, 82 P.3d at 431–432, this case is inapplicable. 209 F.Supp. at 253–54. *Stef Shipping* holds that

"the arbitrator selected by the disputants cannot be expected to play a wholly impartial part." *Id.* at 253. But, *Stef Shipping* was decided in 1962, prior to the publication of the rules of the AAA. *Stef Shipping* may differentiate a party-appointed arbitrator, but still, it did not express a requisite disclosure requirement.

of witnesses and the weight of the evidence; this is the province of the trial judge." *Amfac v. Waikiki Beachcomber Inv.*, 74 Haw. 85, 117, 839 P.2d 10, 28 (1992) (quoting *Nani Koolau Co. v. K & M Constr., Inc.*, 5 Haw. App. 137, 140, 681 P.2d 580, 584 (1984)) (emphasis added). "A [conclusion of law (COL)] that is supported by the trial court's [findings of facts] and that reflects an application of the correct rule of law will not be overturned." *Id.* at 119, 839 P.2d at 29. Moreover, where "a COL [such as conclusion 8] presents mixed questions of fact and law [it] is reviewed under the clearly erroneous standard because 'the court's conclusions are dependent upon the facts and circumstances of each individual case.'" *Id.* (quoting *Coll v. McCarthy*, 72 Haw. 20, 28, 804 P.2d 881, 886 (1991)).

Although the majority overturns conclusion 8,[17] which affirms that Swope carried the burden of disclosure, the findings that support this conclusion are not clearly erroneous. Inasmuch as conclusion 8 involves mixed questions of fact and law, the clearly erroneous standard applies. To summarize, the following findings support conclusion 8:(1) that Swope never disclosed his personal relationship or the extent of his fourteen-year professional relationship with Lichter (findings 8 to 17); (2) that based on Swope's disclosure Daiichi was not concerned because there was nothing in the disclosure that indicated that Swope was currently the attorney for Dr. Lichter, Lichter Trust, or any of the various related Lichter individuals or entities (finding 5); (3) that based on the disclosure, Daiichi believed that Swope's work for Lichter in the past was minimal (finding 6); (4) that Daiichi reasonably believed, based on the language of the disclosure, that Swope's representation of Lichter was "limited to a very narrow matter" and "an isolated instance in the past[ ]" (finding 7); (5) that "[u]pon learning that there was an undisclosed matter where the arbitrator's law firm had represented a corporate affiliate of Daiichi, Daiichi requested that Mr. Swope make a supplemental disclosure relating to his firm's prior work for Daiichi's corporate affiliate" (finding 20); and (6) that "Daiichi would have sought Mr. Swope's disqualification from serving as an arbitrator if, prior to the arbitration, the extent of his involvement and his law firm's involvement with Mr. Friedman, Dr. Lichter, Lichter Trust or the other various Lichter entities had been disclosed" (finding 30).

Here, there was substantial evidence to support the findings. *See Beneficial Hawai'i*, 96 Hawai'i at 305, 30 P.3d at 911 (substantial evidence is "credible evidence ... of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion"). The court listened to the testimony of the participants, observed their demeanor, weighed the evidence and based its findings and conclusions on its observations of the witnesses and on the evidence. As reflected in its decision, the court found that Swope failed to disclose the extensive relationship between himself and Lichter, thus the limited nature of the disclosure misled Daiichi.

This court must give due deference to the court's findings that found Swope violated his duty to disclose. To do otherwise invades the province of the trial court. *Amfac*, 74 Haw. at 117, 839 P.2d at 28. Applying the fundamental tenets of review, the vacatur of the arbitration award should be affirmed.

---

17. COL 8 states as follows:

By disclosing only one discrete and minor representation, Mr. Swope could not shift to Daiichi the burden to investigate and discover the vast expanse of the hidden relationship between the arbitrator and the many Lichter entities. Unlike the facts in *Behring Int., Inc. v. Local 295 International Brotherhood of Teamsters etc.*, 449 F.Supp. 513 (1978) and *Kiernan v. Piper Jaffray Companies, Inc.*, 137 F.3d 588 (1998), the *disclosure in this case was insufficient to shift the burden to Daiichi to investigate or to constitute a waiver of any challenge.*

(Emphases added.) Contrary to the majority's view, conclusion 8 involves a mixed question of fact and law.